[No. 35390. *En Banc.* August 31, 1961.]

THE STATE OF WASHINGTON, *Respondent*, v. HENRY L. THOMPSON, *Appellant.** 

*Reported in 364 P. (2d) 527.

*LeCocq, Simonarson & Durnan* and *Livesey, Kingsbury & Livesey,* for appellant.

*Tom A. Durham* and *Dan R. Olson,* for respondent.

MALLERY, J.—This is an appeal from a judgment and sentence for the crime of murder in the second degree. The appellant is an eighteen-year-old Canadian Indian boy from Deroche, British Columbia. He has a ninth-grade education and is an enrolled member of the Sumas Lakahahmen Tribe No. 52.

On June 14, 1958, he came from his home in Canada to take part in the Stommish, a yearly Indian festival held on the Lummi Indian Reservation near Bellingham. He had been drinking beer in Canada during the morning and continued drinking after his arrival in Bellingham at about 1:00 p. m. At about 8:30 p. m., some friends tried to sober him up in their hotel room. While there, the appellant broke a window, cut himself, and got some blood on his clothing. The friends then went to a movie, but the appellant walked down the street by himself. The purpose of his walk appears in these excerpts from his confessions:

". . . What really made this thing happen was a couple of girls that came back to my mind, that I had seen at the Stommish; that were wearing both tight jeans and blouses or sweaters. . . ." (Exhibit No. 30.)

". . . at that time things that I needed badly had overpowered me, so I went after girl took her beside house, laid for awhile, with nothing happening carried her to back of house near the swings. Though desperate for what I needed fled from her screams. Ran a few blocks then walked, . . ." (Exhibit No. 30.)

"When I saw the woman, near the house, on 'I' St. I do not remember what I said to her. I do know that I intended to have sexual intercourse with her. I remember struggling with her and dragging her up on the lawn.

"When I grabbed the little girl, I had the urge to have sexual intercourse with her also. However I did not have sexual intercourse with the woman or the girl." (Exhibit No. 34.)

At about 9:00 p. m., Mrs. Tussing left her home at the corner of I and Girard streets to take her daugher to the Peterson home to baby sit. Mrs. Tussing did not return home when expected, and her husband called his daughter at the Peterson's and was told she had left some time ago. Shortly after 11:00 p. m., he went out the back door of his home and started to walk down the alley toward the Petersons. Just past the corner of his home, he found his wife lying on the ground. She was bleeding, her eyes were black and swollen shut, and she was naked from the waist down. One of her shoes was in the parking strip. He got some blankets to cover her and then went and got his daughter, who called the police.

The police received the call at 11:45 p. m. and arrived on the scene about five minutes later. Mrs. Tussing was then removed to St. Joseph's hospital where she died a few hours later. The cause of her death was a hemorrhage of the brain caused by a fractured skull.

The following is an excerpt from the appellant's confession:

"Three police officers just took me out to the 2300 block on I Street where I remember being on Saturday night, June 14th. They showed me a house and some blood on the sidewalk and I went with them up between the house at 2301 I St. and the next house where I remember standing over a woman who was lying on her back on the ground by the house. I walked to the back of the house I remember and then came back and took off her underpants and threw them on the ground when a noise in the house scared me so I left. I don't know which way I went from there." (Exhibit No. 31.)

Aaron J. Sunel testified that he had seen the appellant standing at the corner of Girard and I streets at approximately 8:50 p. m.

The appellant further confessed:

". . . I don't remember anything till I found myself standing over this woman beside the house, from there I walked to the back of the house then turned around and went back to the woman, took off her underpants, I then heard a noise, like it came from the house, without waiting

to see what it was fled, after starting to run my mind just went blank till I saw this girl and took her through the hedge, to the side of the house, then we laid for awhile, with nothing happening took her into neighbors yard to where I saw some swings. Right then the girl screamed then I fled, and don't remember which way I went from there till I reached this Service Station. I went to washroom after I came out I told the attendant to phone a cab for me so that I could go to a dance at Lummi." (Exhibit No. 32.)

The girl referred to in the confession was eleven-year-old Sharon Sharp, who lived at 2009 I street three blocks from the Tussing home. She had been visiting a friend that evening and, shortly after 9:00 p. m., started to walk home. As she crossed the street, appellant seized her, put his hand over her mouth, took her behind a neighbor's house, and tried to rape her. She managed to break away and started screaming. The appellant fled. She then ran home and told her mother what had happened. Her mother went across the street to a telephone and called the police. They received the call at 9:32 p. m. As she and Sharon were returning home, Sharon saw the appellant whom she identified to her mother as her molester. They had followed him a short distance down the street, when they saw the police car driven by Sergeant Bullard, who had been dispatched to the scene in response to Mrs. Sharp's call.

Sergeant Bullard had observed appellant walking down the street and the Sharps following him. Thinking the mother and daughter might be the persons who had called the police, he stopped and waited for them to come back to the police car. When they got there, they told him what had happened and described the appellant to him. He radioed the description to the police radio operator, took the Sharps in the police car and searched the neighboring streets for the appellant, but did not find him. He then took the Sharps to the police station.

At 9:55 p. m., Sergeant Bullard's description was relayed to all police cars over the radio. Officer Flockoi, in obedience to the police broadcast, proceeded toward the section of the city in which the Sharps lived. At 10:05 p. m., he

saw the appellant, who answered the description of the radio broadcast, standing in front of the Evergreen Service Station on the corner of Dupont and C streets, approximately twelve blocks from the Sharp home. As he stopped, he observed that the appellant had fresh blood and grass stains on his trousers and that there was a fresh scratch or cut on his face. While questioning him, Officer Flockoi detected the odor of alcohol on his breath. When asked who he was, appellant identified himself as Henry Thompson and stated that he was eighteen years old. He said that he had come to the service station to wash up and to call a cab. Officer Flockoi then called Sergeant Bullard on the radio.

When Sergeant Bullard arrived he also observed the blood and grass stains, the scratch on the face, and the odor of alcohol. Believing that he had found the molester of Sharon Sharp, the Sergeant then took appellant to the police station for further interrogation. This was shortly before Mr. Tussing had reported finding his dying wife in the alley at about 11:00 p. m.

The appellant's counsel as their first assignment of error contend that the arrest by the police was illegal and, therefore, all evidence and exhibits obtained thereby should have been excluded.

We hold that the arrest was lawful. The rule is that an officer may arrest without a warrant if he believes and *has reasonable grounds* to believe that the suspect has committed a felony. *State v. Mason,* 41 Wn. (2d) 746, 252 P. (2d) 298. Someone had feloniously attacked Sharon Sharp. The appellant fitted the police-broadcast description of the criminal. This constitutes reasonable grounds for the arrest.

The appellant contends that there was no proof of *corpus delicti.* He seeks to invoke the rule that proof of *corpus delicti* may not be made *solely* by use of a confession or admission of the accused, and relies upon *State v. Lutes,* 38 Wn. (2d) 475, 230 P. (2d) 786 and *State v. Meyer,* 37 Wn. (2d) 759, 226 P. (2d) 204.

 The appellant has correctly stated the rule, but it is inapplicable in this case. Proof of *corpus delicti* is proof that a crime has been committed. The deceased was found stripped to the waist, covered with cuts and contusions, and with a fractured skull which later caused her death. A fall on the pavement could possibly have fractured her skull, but it is unreasonable to infer that an accidental fall would have stripped her to the waist and produced all the other circumstances presented in this case. A coroner's jury, even in the absence of an arrest or an information relating to the appellant, would be warranted in finding that the deceased had come to her death by criminal means. This is all that is required to establish that a crime had been committed. It is true that appellant's confessions did corroborate the fact that the cause of death was criminal in nature, but such corroboration, though permissible, was not needed to establish the *corpus delicti* in this case in view of the other circumstances.

 The appellant contends that the introduction of evidence of another crime, namely, the assault on Sharon Sharp, was reversible error.

We do not agree. The evidence was admissible under the rule as stated in *State v. Sedam,* 46 Wn. (2d) 725, 284 P. (2d) 292, wherein we said:

"Secondly, proper evidence is not to be excluded because it may also tend to show that the accused has committed another crime, unrelated to the one for which he is being tried. . . . The test is, *does the questioned evidence tend to establish* (1) motive, (2) *intent,* (3) absence of accident or mistake, (4) a common scheme or plan, or (5) *identity. State v. Hartwig,* 45 Wn. (2d) 76, 78, 273 P. (2d) 482 (1954)." (Italics ours.)

In instruction No. 6, the jury was specifically instructed that the evidence of the other crime was admitted solely to establish *intent* and *identity,* and that the jury could not find the appellant guilty of the crime charged simply because it believed him guilty of the other crime.

The testimony relating to the crime against Sharon Sharp established the *identity* of the person who was in the neigh-

borhood of the crime charged, and the existence of his *intention* to commit a sexual assault.

The evidence was admissible to prove these things and was limited by the instruction to this proper purpose. Its admission was not error.

The appellant contends that evidence of an attempted rape of an eleven-year-old girl is so inflammatory and prejudicial that it should have been excluded on any account.

■ Paraphrasing the language of an oath, a trial is a search for the truth, the whole truth, and nothing but the truth. No reason has been advanced why a jury would convict an innocent man because all of the pertinent facts show the crime was a heinous one. Moreover, all the facts are particularly necessary in this case because the appellant was charged with first degree murder. In such a case, it was the province of the jury, had he been convicted of first degree murder, to have determined the nature of the penalty to be imposed. To expect it to do this without all the facts would defeat the legislative purpose in giving it that function.

The appellant contends that the verdict of guilty of murder in the second degree cannot stand because, under the facts in this case, he is either guilty of murder in the first degree or of nothing. He cites RCW 9.48.030 and 9.48.040, which provide, *inter alia:*

"The killing of a human being, unless it is excusable or justifiable, is murder in the first degree when committed either— . . .

"(3) Without design to effect death, by a person engaged in the commission of, or in an attempt to commit, or in withdrawing from the scene of . . . rape . . ."

(RCW 9.48.030.)

"The killing of a human being, unless it is excusable or justifiable, is murder in the second degree . . .

"(2) When perpetrated by a person engaged in the commission of, or in an attempt to commit, or in withdrawing from the scene of, a felony other than those enumerated in RCW 9.48.030. . . ." (RCW 9.48.040.)

The appellant argues that the state's case was predicated upon his killing of Mrs. Tussing while attempting to commit the crime of rape, and that, accordingly, under the statute his crime could not be murder in the second degree.

We do not agree. The jury was specifically instructed that murder in the second degree was an included lesser offense, and that it might find the appellant guilty of murder in the second degree if it found him guilty of the crime of *assault* in the second degree. This instruction warranted the return of the verdict in question because rape or attempted rape does not exclude the commission of an assault. Indeed, an assault is generally the implementation of a rape, except, of course, when it is statutory rape. The jury was instructed on the crime of assault in the second degree. It evidently found that the appellant was guilty of assault rather than attempted rape and, therefore, returned a verdict of murder in the second degree. The verdict was proper.

The appellant was arrested for the attempted rape of Sharon Sharp, but, in accord with the local police custom, he was held on an open charge by being booked for intoxication while an investigation of the attempted rape of Sharon Sharp and the murder of Mrs. Tussing was being made. He was arraigned on the instant charge six days after his arrest. At that time, the court appointed counsel for him.

Appellant now contends that his confinement on an *open charge* prior to his arraignment was illegal.

We do not agree. Appellant was legally arrested for a felony. He was held on a so-called open charge to permit a reasonable investigation before the filing of an information. The police record or *booking* is not the charge upon which a defendant goes to trial and has no particular significance after a formal charge has been lodged. Had he cared to question his confinement prior to filing the information, he could have done so by habeas corpus. After the filing of an information, habeas corpus will not lie.

Based upon appellant's theory that his confinement prior to the information was illegal, he now contends that his confessions made during that period were inadmissible at the trial on the instant charge.

During appellant's confinement prior to arraignment, he was questioned by police officers and made a series of confessions. He was visited by his sister the day after his arrest and by his father and sister three days later. Officer Geleynse overheard him tell his sister he had committed the offenses against the deceased and Sharon Sharp.

RCW 10.58.030 provides:

"The confession of a defendant made under inducement, with all the circumstances, may be given as evidence against him, *except when made under the influence of fear produced by threats*; but a confession made under inducement is not sufficient to warrant a conviction without corroborating testimony." (Italics ours.)

The appellant has never contended that he was coerced by threats into making the confessions. While he was questioned at some length over a period of five days, it is not contended that this period was so protracted that he no longer knew what he was doing or that he would have signed anything to stop the questioning. Nothing in the record indicates that he was so ignorant or fearful of the officers that he would confess to a crime which he did not commit.

An interrogating officer explained to appellant that he did not have to answer the questions if he did not want to, and that he had a right to have an attorney. This statement was contained in all his written confessions, but, notwithstanding that, he testified at the trial that he did not know what "the right to counsel" was. The jury was not obliged to believe this in the light of the conflicting evidence. In any event, he did not request an opportunity to procure or consult counsel prior to arraignment.

The admissibility of confessions is not limited to those made by and with the advice of counsel or to those that are pertinent to a criminal charge pending at the time they

608

are made. The confessions and other exhibits were properly admitted in evidence.

The appellant has not been denied due process of law because an attorney was not appointed prior to his arraignment and the making of his confessions. They were admissible under the provisions of RCW 10.58.030, and the rule of *State v. Winters,* 39 Wn. (2d) 545, 236 P. (2d) 1038.

■ The appellant's contention that the failure to arraign him promptly constitutes reversible error is without merit. There is neither statute nor case law in this state requiring prompt arraignment. Indeed, a defendant may be arraigned even after the trial is commenced and the jury impaneled. *State v. Lane,* 37 Wn. (2d) 145, 222 P. (2d) 394.

■ Finally, the appellant assigns as error the refusal of the trial court to allow a doctor-hypnotist to testify as to the out-of-court statements made by the appellant while under hypnosis. When the appellant sought to introduce this testimony at the trial, the state objected on the ground that the statements were incompetent and self-serving. The trial court sustained the objection, and the appellant made no offer of proof. This court has consistently held that there can be no appellate review on the exclusion of evidence without an offer of proof. *State v. Griffith,* 52 Wn. (2d) 721, 328 P. (2d) 897.

The judgment and sentence are affirmed.

FINLEY, C. J., OTT, FOSTER, and HUNTER, JJ., concur.

DONWORTH, J. (dissenting)—The majority fails to find reversible error in the trial court's admission of the testimony and exhibits regarding the attempted rape of Sharon Sharp, an eleven-year-old girl. I differ.

I do not think that there can be disagreement on at least three points: (1) That the assault upon Sharon Sharp was unrelated to the crime charged (namely, the murder of Mrs. Ethel Tussing), (2) that evidence of unrelated prior crimes is normally excluded, and (3) that there are a number of well-recognized exceptions to this exclusionary rule.

The evidence of the attempted rape of Sharon Sharp was admitted by the trial court (over appellant's objection) as bearing on both the *identity* and the *intent* of the accused, these being two of the exceptions to the rule. The court instructed the jury that the evidence relating to "the possible commission" of this other crime was admitted for these two purposes and no other.[1] The question left unanswered by the majority (at least to my satisfaction) is in what way or ways was the evidence of the assault on Sharon Sharp essential to prove the elements of identity and intent in connection with the charge of the murder? As was said in *State v. Dinges,* 48 Wn. (2d) 152, 292 P. (2d) 361 (1956):

" . . . the true test of admissibility is that the evidence of other criminal offenses must be relevant and necessary to prove *an essential ingredient* of the crime charged."

In other words, to be admissible, the evidence introduced relating to another crime must not only tend to prove the crime charged, but must also be necessary to prove an essential element thereof.

In the case at bar, the accused was identified by two of the state's witnesses (besides Sharon Sharp) as having been in the vicinity of the place where the crime charged was committed at about the time of its commission. Furthermore, it goes without saying that Sharon Sharp and her mother could have identified the accused without going into the inflammatory details of the alleged assault—details which consume many pages of the trial record, cited *infra.* Not only did the trial court admit in evidence all of the testimony introduced pertaining to the assault incident, but also seven exhibits relating thereto, including the blouse

---

[1]Instruction No. 6. "The Court has allowed testimony and evidence concerning the possible commission of another crime involving a minor child. The Court has permitted this evidence for two purposes and none other. One, the establishment of intent, and two, the establishment of identity.

"You, the Jury, shall not use this testimony and evidence in any other way than specified above and you shall not convict the defendant of the crime charged in this action, merely because you may believe him guilty of some other crime."

and pedal pushers worn by the young girl. In addition, the several confessions which appellant gave the police officers during the five days between his arrest and the filing of the murder charge contained numerous references to the assault upon Sharon Sharp.

As to the matter of intent (which is one purpose for admitting the Sharp testimony in this case), the only reference made to it in the majority opinion is that "The testimony relating to the crime against Sharon Sharp established . . . the existence of his [appellant's] *intention* to commit a sexual assault." I ask, an assault upon whom? By implication, the majority is holding that a sexual assault upon one female (after the murder of another) in some way evidences an intention to sexually assault the female who was allegedly murdered shortly before. Even assuming (for purposes of argument) that an attempt to rape one female is some evidence of an intention to rape another, there still remains a weighing process for the trial court. The question to be answered is, is the probative value of such evidence outweighed by the prejudice which it engenders in the minds of the jurors? In the present case, I think that the materiality is outweighed by the prejudice which was instilled in the minds of the jury.

This weighing process was graphically described in *State v. Goebel*, 36 Wn. (2d) 367, 218 P. (2d) 300 (1950), as follows:

" . . . we are of the opinion that this class of evidence, where not essential to the establishment of the state's case, should not be admitted, even though falling within the generally recognized exceptions to the rule of exclusion, when the trial court is convinced that its effect would be to generate heat instead of diffusing light, or, as is said in one of the law review articles above referred to, where the minute peg of relevancy will be entirely obscured by the dirty linen hung upon it. This is a situation where the policy of protecting a defendant from undue prejudice conflicts with the rule of logical relevance, and a proper determination as to which should prevail rests in the sound discretion of the trial court, and not merely on whether the evidence comes within certain categories which constitute exceptions to the rule of exclusion. . . . "

The *Goebel* case again came before this court in 40 Wn. (2d) 18, 240 P. (2d) 251 (1952) and, in a concurring opinion, Judge Hill (the author of the majority opinion in the first *Goebel* case) pointed out:

"When the prejudicial effect of evidence is obvious, and the relevancy, if any, is so microscopic that it is difficult to determine its existence, it should not be admitted against the defendant in a criminal case. I can, however, concur in the affirmance of the conviction in this case because the trial court, by its instruction, limited the consideration of exhibit 19 [a signed confession of the defendant relating the details of an assault by him upon a woman other than the prosecutrix—a crime not charged in the information] to the rape counts, and on those counts the defendant was acquitted."

The fact pattern of the case before us should not be confused with the situation where the defendant is on trial for a sex offense and the state introduces evidence of other acts of sexual misconduct *with the prosecutrix* (rather than another female) even though the other acts constitute separate crimes. As was held in *State v. Thorne*, 43 Wn. (2d) 47, 260 P. (2d) 331 (1953).

". . . Such evidence is admitted for the purpose of showing the lustful inclination of the defendant *toward the offended female*, which in turn makes it more probable that the defendant committed the offense charged." (Italics mine.)

In *State v. Priest*, 132 Wash. 580, 232 Pac. 353 (1925) this court had occasion to consider the question of the admissibility of testimony relating to sexual offenses other than the offense charged. The case involved sexual assaults upon three young girls (sisters living in the same home) which took place within a few minutes of one another. The court held:

". . . The several assaults were so nearly related and were so far a part of the same transaction as to make it almost impossible to show the one without showing the others, and it would seem that the evidence was within the rule that permits the state to show a separate and distinct offense when the offense is so far related to the offense on trial as to form a part of the same transaction."

Furthermore, the court hastened to add that:

" . . . both the prosecuting attorney and the court did all that was possible to keep the separate offenses from the knowledge of the jury."

As will be illustrated, *infra*, this was hardly true with respect to the case at bar.

In *People v. Gibson*, 255 Ill. 302, 99 N. E. 599 (1912), the supreme court of Illinois passed upon the issue and held:

" . . . [Defendant] was tried for rape upon Ida Cedergren. If, as is alleged, he a few minutes later committed a like offense against Nora Porter, it no more formed a part of the transaction with Ida, and was no more an explanation of that act, than if it had been committed in her presence on another occasion. . . . The mere proximity of time within which two offenses may be committed does not necessarily make one a part of the other. Immediateness is not the true test. There must be a causal relation or logical and natural connection between the two acts or they must form parts of but one transaction." See, also, 167 A. L. R. 565.

To indicate the extent to which the prosecution delved into the attack upon the eleven-year-old girl, the following excerpts from the statement of facts are set out verbatim. On direct examination, Mrs. Lena Sharp (the mother of Sharon) testified:

"Q. And recalling again your attention to the night of June 14th, 1958, will you tell the jury where you were that night? A. I was at home in bed at 2009 I Street. Q. And who was there with you? A. I had just the two babies with me. The other children had been out playing; they was coming home. Q. Now, will you tell the jury what, if anything, occurred that night? A. Well, the children started coming home one at a time and I asked them where Sharon was. They said she'd started home but she hadn't got there yet, and then I had a friend visiting me and we heard a scream. Mrs. Smith was with me. And I didn't pay much attention to it, I thought, oh, just children playing. Then my little girl burst in the house. Q. Which little girl was that? A. Sharon. She was staggering and she was mumbling, I couldn't understand, and then I got out of her she— . . . Q. Did she make a complaint? A. Yes, finally. I had to shake her. I couldn't understand

her; she was kind of hysterical. Q. Now, as a result of that complaint, what did you do? A. She said, well, 'An Indian grabbed me— . . .' Q. What, if anything, did you do after you heard her complaint? A. I jumped up and went across the street and called the police. Q. Do you know what time that was? A. No, I couldn't say exactly the time. Q. And will you describe her clothing? A. She had on aqua pedal pushers and a little striped shirt, or blouse. Q. And will you describe their condition? A. You mean what I was wearing? Q. No, the condition of the clothing, if there was anything unusual. A. I never noticed at the house at all. Q. I will show you what has been marked for identification as Plaintiff's Exhibit Number 47. Will you— A. (Interposing) That looks like Sharon's, yes. . . . Q. Now, after you called the police, what, if anything, did you do? A. I came back home and asked her to take me out and show me where this happened. . . . Q. And where did you go when you went out? A. She showed me where he had came up behind her and put his hand over her mouth and drug her across the yard."

Sharon Sharp, on direct examination, testified:

"Q. And now, Sharon, recalling your attention to Saturday evening of June 14th, 1958, will you tell the jury, please, where you were and what, if anything, occurred? A. Well, I was over at my girl friend's house, Daryl Lopay, and I started walking home. It was, oh, I don't know what time it was exactly; it was just about getting dark, and I started walking home, and on the way home just before I started to cross the street, I saw this Indian walking toward the Fountain Drug, and I didn't think anything about it. And so he kept on walking. When I got past the hedge down by our house, I heard something behind me and I turned around and there was this Indian. It was the same one that was walking down there, and he—I started to run, and when I was toward the driveway, I slipped and he grabbed hold of me. . . . Q. . . . Go ahead and just tell the jury now in your own words what happened? A. Well, he grabbed ahold of me and then he told me if I yelled or said anything that he'd kill me, and— . . . Q. (By Mr. Olson) Now, Sharon, after you fell close to the driveway there and this Indian grabbed you and told you that if you screamed he'd kill you, what, if anything, happened? A. Well, we got up and he had my arm behind me and he took me over behind the hedge between the

two houses and told me to lay down, and I laid down and then he had his hand over my mouth and he pulled my pedal pushers down. And then about a minute later we heard someone up on the porch, and we got up and he took me over behind the house, and when he was behind the house, he put me down on the ground again and he had his hand over my mouth and he told me to take a deep breath, and I started to scream, and his hand slipped off my mouth and I kept on screaming, and he got up and ran away and I got up and ran home. And when I was near my house, my mother, my brother and my sister came out and then they wanted to know what happened, and I was screaming and I got up and, I went into the house to where my mother was and I told her what happened. Q. What did you tell your mother, Sharon? A. I told her that the Indian had grabbed me and that he attacked me. I don't remember what I said, really. . . . Q. And now will you continue and just, if you can now, point out to the jury where it was that he attacked you first, and just go through, show them where you went, what happened? A. I walked across here and then he came from here, I guess. When he was about here—no, about here, I turned around and saw him and I ran across here. There's a driveway here, and I fell toward there and he took me across here, and in there, and laid me down here. Q. And then what happened? A. Well, then after while, there was a woman there and we got up and we went back here, and there's some swings here, and he took me down here, and I started screaming. He ran toward that way, toward the Fountain Drug, and I got up and ran home. . . . Q. That's fine. Now, Sharon, I will show you what has been marked for identification as Plaintiff's Exhibit Number 47 and ask your whether or not you can tell the jury what these are. A. Those were my pedal pushers. Q. That you were wearing that night? A. Yes. Q. And what about what has been marked for identification as Plaintiff's Exhibit Number 48? Can you tell the jury what that is? A. That was my blouse that I was wearing. Q. That you were wearing that evening. Now, Sharon, I will ask you whether or not during this struggle, now that you have related, did you have an opportunity to look at the defendant, or I mean at the Indian that attacked you?"

In the course of the prosecutor's closing argument, frequent and detailed references to the Sharon Sharp incident were made, as follows:

"Now, what time did this attack on Sharon Sharp take place? Officer Haickel testified and Plaintiff's Exhibit 63 shows that the call by Mrs. Sharp, that Sharon had been attacked, was made to the police station at 9:32 p. m. on June 14th. The state has proved by Sharon Sharp that she was attacked just minutes before this call. Sharon testified that she was at her girl friend's house a block away, that she was unsure exactly what time she left. She said she thought her girl friend had to go in around 9:00 o'clock and she later testified as she went along there that after she went in, why, she stood out there a while and talked to her through her bedroom window. Sharon then testified that she walked the block to the corner of Girard and I and that the attack occurred.

"Now, the actual attack which occurred was really in two stages, if you recall, and it couldn't have taken more than five minutes. Sharon testified that the defendant had her behind the hedge for a couple of minutes, that he then took her in back of the swings for a few seconds, where he held her and that she freed herself by screaming. She then ran home, which was two or three doors down. Her mother shook her for a minute, hurriedly dressed and dashed across the street to call the police station. From this testimony the state contends that we can prove beyond a reasonable doubt that the attack on Sharon Sharp occurred not more than five or six minutes before the police call. This then would give the defendant ample time to have met and attacked Ethel Tussing sometime shortly after 9:00 and then to have met Sharon Sharp on his way back to town.

"Now, can we be sure that the defendant attacked Sharon Sharp? We contend that the evidence shows beyond a reasonable doubt that the defendant was the attacker and was positively identified as such. . . . He states in his statement in Plaintiff's Exhibit 34: 'When I grabbed the little girl, I had the urge to have sexual intercourse with her also.' Then again in Plaintiff's Exhibit 31, it goes on to say: 'I remember grabbing a little red-headed girl and taking her through an opening in a hedge and back alongside the house where I took her pants down and laid her on the ground and tried to have intercourse with her, but was not able to.'"

If appellant had been on trial solely for the assault on Sharon Sharp, the state could not have introduced evidence relating thereto in any greater detail than it was

permitted to do in this case, in which he was being tried on the information charging him with the murder of Mrs. Tussing.

The two purposes for admitting the evidence relating to the assault on Sharon Sharp were stated by the trial court, in its instruction No. 6, to be the establishment of (1) intent, and (2) identity.

Under our decision in the first *Goebel* case, *supra,* the trial court was confronted with the problem of deciding whether the protecting of appellant from undue prejudice was outweighed by the logical relevance of the proffered evidence. In my opinion, the trial court in this case abused its discretion in admitting this evidence because its prejudicial effect was devastating and its necessity to prove intent and identity was minimal.

Mrs. Sharp and her daughter could have identified appellant as being in the vicinity of their home (which is about two blocks from where Mrs. Tussing was killed) shortly after nine o'clock p. m. on June 14, 1958. Consequently, the details of the assault on Sharon were unnecessary to establish identity.

As to the element of intent, this evidence had no bearing as tending to show that appellant had a lustful inclination *toward Mrs. Tussing.* It was entirely immaterial to the crime for which appellant was being tried. No decision of this court has come to my attention (other than the majority opinion in this case) in which it has been held that evidence of sexual attacks on a female other than the prosecutrix is admissible as tending to show a lustful disposition toward the prosecutrix. In other words, intent to assault Mrs. Tussing cannot be inferred from a showing that appellant had a lustful disposition toward an eleven-year-old girl, or that he had a lustful disposition generally.

After reading the record in this case, I am convinced that "the minute peg of relevancy . . . [was] entirely obscured by the dirty linen hung upon it." Because of the court's abuse of discretion in admitting the detailed evidence of an independent crime which was neither necessary nor competent to prove the crime charged, I would

remand the case with directions to grant appellant a new trial.

WEAVER and ROSELLINI, JJ., concur with DONWORTH, J.

HILL, J. (dissenting)—I am impelled to a short, separate dissent, because I am not in accord with all that Judge Donworth says in his dissent relative to the inadmissibility of some evidence of the assault on Sharon Sharp. I must agree with him, however, that the state, under the guise of proving identity and intent, launched into practically a full scale trial of the defendant for the attempted rape of Sharon Sharp.

When the pages upon pages of testimony with relation to that offense are considered, together with the exhibits relating to it, it is difficult to see what additional testimony could be introduced had the defendant actually been charged with that offense. Under such circumstances the defendant did not have a fair trial.

Obvious guilt is no justification for a manifestly unfair trial. In my opinion there should be a new trial.

---

October 26, 1961. Petition for rehearing denied.