[No. 39656.    En Banc.    September 11, 1969.]

THE CITY OF SEATTLE, *Respondent*, v. LEE JAMES GERRY, *Appellant*.*

*Reported in 458 P.2d 548.

*McIntosh & Simmons,* for appellant.

*A. L. Newbould* and *H. Joseph Coleman,* for respondent.

McGovern, J.—Defendant Lee James Gerry appeals from a two-count conviction of violating the traffic laws of the city of Seattle; (1) failing to stop for a red traffic control light, and (2) failing to stop and identify himself at the scene of an accident in which he was involved and another party injured.

Sometime after the accident, defendant went to the north end precinct of the Seattle Police Department, obtained an accident report form and commenced making his written statement as required by both state and city law. He had written the location of the accident and his name on the report when, by circumstance, the police officer who had visited the scene of the accident walked by, glanced at the report, and realized that defendant might be reporting on the same accident. Defendant responsively stated that he would be willing to speak with an officer of the traffic division special detail but no other conversation took place between him and that officer.

Officer Wood, representing the traffic special detail, thereafter arrived and was briefed by the first police officer. He then advised the defendant of his constitutional right to be represented by legal counsel, of his right to remain silent, and further told him that anything he said might be used against him in a court of law. Thereafter, defendant orally admitted the hit-and-run offense and signed a statement to that effect, which statement was thereafter admitted as an exhibit in the cause.

It is the admission of that incriminating statement into evidence which gives rise to the dispositive assignment of

error. Defendant insists that although Officer Wood may have orally advised him of his constitutional rights to counsel and silence, nonetheless he did not understand what was said. From that starting point he argues that he cannot be held to have waived that which he did not comprehend.

During the course of trial it was the announced intention of defendant to persuade the court, sitting without a jury, that he, the defendant, was not aware of these rights. Toward that end he attempted to testify about his limited educational and environmental background and about his inability to understand what might be to others simple, ordinary language. He would, by such method, refute the position of the prosecution that he had waived his rights to counsel and silence. The record discloses that the following colloquy then occurred:

THE COURT: You are putting him on for a limited purpose. The only thing I am interested in is whether or not that statement was voluntarily made. Are you claiming he can't read and write? MR. McINTOSH: We are contending this particular individual does not have a full awareness or capability of understanding his right to counsel; he does not have a proper understanding so as to make any admissions or confessions voluntarily. It goes to the question of his own personal capabilities and background and abilities. THE COURT: Do you have any psychiatrist that is going to testify? MR. McINTOSH: No. THE COURT: Objection sustained. I am not going into it. He looks all right to me. He answers your questions properly. I am only interested in whether or not Exhibit 1 was made according to what the officer said it was. If it wasn't he can tell me it wasn't. MR. McINTOSH: Your Honor, the question of whether this man could understand is certainly relevant as to whether there was a voluntariness or any efficient waiver of right to counsel. THE COURT: No, you would have to bring someone in here, you would have to have him examined and they would have to testify he didn't know what he was doing. He looks perfectly all right to the Court. MR. McINTOSH: That is what we are offering to prove, that this man did not know what he was doing or being required to do and his knowledge and limitations of that knowledge are based on limitations of capability and of education. THE COURT: Then he shouldn't be driving a Cadillac.

It is not difficult to perceive of more acceptable criteria for determining one's ability to understand the English language than the looks of that person or the make of car he drives. Had the court allowed his testimony, it is probable that such criteria would have been readily apparent.

■ One's understanding is best explained by him whose subjective is involved, not by someone else. What that person says, though, is of course a matter of evidence and need be given only such weight as the trier of fact thinks it is entitled to receive. For those reasons Mr. Gerry should have been allowed to testify concerning his capabilities for understanding.

That is so because if he did not understand what Officer Wood told him, and if he was not otherwise aware of those rights, then his incriminating statement would not have been admissible. "One cannot effectively waive . . . a constitutional right without knowledge of its existence." *State v. Tetzlaff,* 75 Wn.2d 649, 453 P.2d 638 (1969).

The United States Supreme Court has also made it clear that an understanding is prerequisite to a constitutional waiver. In *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966) it said: "[A] heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self incrimination," and that "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently."

We are constrained to consider an additional assignment of error. In the event of retrial, it is likely that defendant would again insist that his confession is not admissible as evidence because it constitutes the product of a legally privileged communication. He states that he made a report of the accident as required by state law (RCW 46.52.030) and Seattle city ordinance No. 91910, and that the city then used the report against him in the trial of his case. He said this was done in spite of the fact that the governing statute (RCW 46.52.080) and the Seattle ordinance expressly provide that "No such accident report or copy thereof shall be

used as evidence in any trial, civil or criminal, arising out of an accident."

▇ The record does not support defendant's argument. Reference to the report was made on direct examination by only one city witness, Officer Berney Miller. He testified that when he first saw the defendant "At this time he was starting an accident report form and as I walked by I glanced at it and he had his name and he had started the location of incident on the accident form." The report itself was not before the court, nor were any of its details, and no other direct reference to it was made by the city. That being so, its privileged nature was in no way violated. The report, therefore, has no bearing on the admissibility of defendant's confession.

The sentence is set aside and the judgment of the trial court reversed.

HILL, FINLEY, WEAVER, ROSELLINI, HAMILTON, and NEILL, JJ., concur.

HALE, J. (dissenting)—I find no sound basis for reversing this judgment of conviction. Defendant, well knowing that he had given a written confession, waived all pretrial procedures available to him under Criminal Rule for Superior Court 101.20W, RCW vol. 0, and made no motion to suppress his confession nor object to its admissibility until the commencement of the trial. Only then did he divulge that he would assert a form of mental irresponsibility or mental retardation as a basis upon which to claim his statements were involuntary. He left the prosecution in the dark concerning this ingenious plea until at trial when his counsel for the first time introduced the subject, saying:

Now at this time we move to strike and suppress from evidence any statements given by the defendant to any police officers in the course of investigation of this accident. I think we are entitled to a hearing on the question of voluntariness of any statements or investigations.

The court then ruled:

THE COURT: Since this is a trial to the Court the Court

can hear the testimony and if it feels that it is true it can dismiss the evidence. MR. McINTOSH: I was going to suggest that but I wanted to get it into the record. THE COURT: I don't see any sense in having two hearings, do you? MR. McINTOSH: No, I don't, except as a practical matter for the purpose of the record I wanted to make it clear. THE COURT: Very well. I will bear that in mind as we go along.

Thus, with defendant's agreement, the court proceeded to hear the city's case.

During trial, police officers described the making of the confession, and the court, in accordance with its earlier announcement, reserved ruling on its admissibility until the city had rested its case in chief. Thereupon, the defendant, testifying only in support of his motion to suppress under CrR 101.20W, gave his version of the circumstances surrounding the making and signing of the confession. After he had gone no further in his testimony than to say that he was 31 years old and born in Shelton, Washington, the following colloquy established the purported predicate upon which the majority finds the confession to have been involuntary:

Q. Were you in the military service? A. Yes, I was. Q. Did you receive some education there? A. Yes, I did. Q. What sort of education did you get in the service? MR. ANDERSON: I'm going to object to this, Your Honor. I can't see the relevance of it. THE CLERK: Defendant's Exhibit No. 2 for identification. THE COURT: You are putting him on for a limited purpose. The only thing I am interested in is whether or not that statement was voluntarily made. Are you claiming he can't read and write? MR. McINTOSH: *We are contending this particular individual does not have a full awareness or capability of understanding his right to counsel;* he does not have a proper understanding so as to make any admissions or confessions voluntarily. It goes to the question of his own personal capabilities and background and abilities. THE COURT: Do you have any psychiatrist that is going to testify? MR. McINTOSH: No. THE COURT: Objection sustained. I am not going into it. He looks all right to me. He answers your questions properly. I am only interested in whether or not Exhibit 1 was made according to what

the officer said it was. If it wasn't he can tell me it wasn't. MR. McINTOSH: Your Honor, the question of whether this man could understand is certainly relevant as to whether there was a voluntariness or any efficient waiver of right to counsel. THE COURT: No, you would have to bring someone in here, you would have to have him examined and they would have to testify he didn't know what he was doing. He looks perfectly all right to the Court. MR. McINTOSH: That is what we are offering to prove, that this man did not know what he was doing or being required to do and his knowledge and limitations of that knowledge are based on limitations of capability and of education. THE COURT: Then he shouldn't be driving a Cadillac. MR. McINTOSH: Of course a Cadillac can be procured pretty cheap, particularly 1955 ones. THE COURT: I am not going into it. I will give you an exception.

(Italics mine.)

Just what it was that defendant was offering to show is as unclear to me as it was to the trial judge. Counsel did not reply to the court's query as to whether the defendant could read or write, nor did he offer to prove that defendant could not understand the English language. When the court stated that he was—as to that phase of the case—interested only in "whether or not that statement was voluntarily made," defendant, I think, made his mental condition a subject for expert opinion. How else can one interpret counsel's offer to prove that

> this particular individual does not have a full awareness or capability of understanding his right to counsel . . . It goes to the question of his own personal capabilities and background and abilities. . . . that this man did not know what he was doing or being required to do and his knowledge and limitations of that knowledge are based on limitations of capability and of education.

If defendant was offering to show mental retardation, incompetence, or inability to comprehend the English language, his counsel should have said so instead of positing a hypothesis in psychiatry. Thus, when the court said, "He looks perfectly all right to the Court," it was in effect

ruling that the court ought not accept the defendant layman's opinion concerning the subtle, complicated and esoteric subjects embodied in the offer of proof from the party who was asserting his own incompetence and want of ability to comprehend. I think that the court quite properly excluded the purported opinion evidence of a nonexpert particularly that of the very nonexpert who, while urging his expertise, claimed to lack the capacity to understand his right to remain silent under the constitutions and the other privileges afforded him under *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966).

Therefore, in my opinion, defendant's offer of proof embodied no promise to prove any material or relevant fact by competent evidence and was, therefore, properly denied.

But if, under some esoteric theory of constitutional law which thus far I am unaware, the court was in error, it was indeed a trifling and harmless one for the defendant did testify in detail as to his observations and reactions which would show him to be in full touch with reality at all times. On direct, he said that he went to the Wallingford police station to report an accident; he informed the officer at the desk, whom he referred to as a desk officer, that he had come there to report an accident. He said he was given a paper to fill out, tried to fill it out and, after obtaining help, did fill it out. He said that, before completing the accident report, an officer whom he thought to be the desk sergeant told him to come in the back room; and while he was in this room working on the accident report, a police officer gave his name to defendant and, as the defendant described it, "Well, he said something about, you can get an attorney or a lawyer or something, and I wanted to fill out my accident report."

Still on direct examination, defendant went on to say that the officer questioned him for about a half hour; he was then asked to sign a paper which he thought was a part of the accident report. He said he tried to read it, that he could read a little. He acknowledged that the paper contained his signature, but said he did not know it was a

confession. He did not, however, at any time repudiate his statements, claim that they were coerced, involuntary or false—or that he demurred to signing it. He at no time said he was under arrest, in custody or suffering from any form of coercion.

It is clear that when counsel told the court, "We are contending this particular individual does not have a full awareness or capability of understanding his right to counsel," he was not speaking of coercion or involuntariness but rather intended to go into the nuances of mental capabilities and the subtleties of the processes of comprehension. These matters, I think, are properly reserved for experts and not subject to the opinion testimony of laymen, and the court properly rejected the offer. Defendant's direct examination presented no facts repudiating the voluntariness of the confession for he never disputed that the officer told him he could have an attorney present, but stated merely that he thought he did not need a lawyer to assist him in making out an accident report.

On cross-examination, too, he acknowledged that he voluntarily went to the police station to report an accident he had been involved in and that no one told him he was under arrest. He admitted he had collided with a Volkswagen and that this was the accident he was going to report, answering, "I remember the Volkswagen and that's the last I remember." The court could well find that he remembered more than that, however, for he admitted that his initials, "L.G.," appeared on pages 1 and 2 of the confession; that he had pointed out two mistakes in it and had the officer correct them, and that he initialed the corrections. Referring to the confession, he testified:

Q. And this is the document which the officer handed you and asked you to read, is it not? A. Yes. Q. And this is the document which you in fact read, is it not? A. Well, I read—yeah, I read that and the other part. Q. And this is the one which you had the corrections to make on that we just talked about? A. Yes, that and the other part, too.

In detail, he corroborated not only that the confession was

voluntary and that he knew what he was doing when he signed it but that he was not restrained of his freedom of movement nor in custody when he made the confession and read and signed it.

Evidence in chief presented to prove defendant guilty of the offense charged also strongly corroborated defendant's confession in detail. This evidence was heard by the court before it ruled upon the motion to suppress his confession. Mrs. Hazel P. Ruppert, called by the city, testified that she was driving north on 11th Street N.E. in Seattle at about 10 a.m., November 24th, in a Volkswagen with her four young children as passengers. She entered the 50th Street intersection with a green light and at the middle of the intersection became aware that a car was coming toward her at a high rate of speed, "coming," she said, "into the intersection without stopping." She applied the brakes and turned to the right to avoid it and "As I turned to the right the rear end of his car hit the front left of my car turning and going east and I saw his car go on up the hill just before my car turned over on its side in the intersection." Her car turned over and she was taken to the hospital. No one at the scene identified himself as the driver of the car which had struck her. One of Mrs. Ruppert's children, also called as a witness, testified that he was a passenger in the Volkswagen and that they were struck by a car that sped away without stopping.

Arthur Woods, a disinterested witness, saw the accident. He was driving north on 11th Street, saw the Volkswagen enter the intersection with the green light, saw a Cadillac going east too fast to stop, saw the Volkswagen swerve, get hit and roll over and saw the Cadillac, a 1955 or 1956 model, keep on traveling east without stopping and then moving out of sight.

Police Officer Berney L. Miller testified that he arrived at the scene of the accident to find a Volkswagen turned over on its left side with the injured driver still inside and no other vehicle there which appeared to have been in an accident. No one came forward to identify himself as the

driver of another vehicle. There were no skidmarks except those obviously made by the Volkswagen.

Officer Miller took Mrs. Ruppert's children to the hospital for treatment and about an hour later returned to precinct 2, Wallingford Station, to complete an accident report form. He said that when he entered the station he saw Mr. Gerry seated there and apparently starting to make out an accident form:

> A. At this time he was starting an accident report form and as I walked by I glanced at it and he had his name and he had started the location of the incident on the accident report form. Q. Did you have any conversation with Mr. Gerry at that time? A. Yes, sir. I asked him if he would mind waiting for an officer from Special Detail. MR. McINTOSH: I didn't hear. A. I asked him if he would mind waiting at the station for an officer from Special Detail to discuss this accident. Q. What was his response to your request? A. He said he didn't mind waiting. I told him he could finish his accident report form, work on it. Q. Did you have any further conversation with him? A. No, sir. That was the extent of my conversation.

The officer said that the accident report forms required of drivers are fairly difficult to fill out and that everyone asks questions of police officers in the station. He answered some for defendant and also let him use the phone book for some addresses needed in completing the form.

All of this evidence supports and dovetails as to time, place and circumstances with the contents of defendant's confession and admissions and brings us to the evidence presented by Police Officer Donald E. Wood of the Special Detail assigned to accident investigation, i.e., Traffic Special Detail. He said that he was called to precinct station 2 by Officer Miller and, on arriving there and after speaking with Miller, talked to Mr. Gerry, the defendant. He said that he warned the defendant:

> A. I advised Mr. Gerry that he had a right to remain silent, that anything he said could be used against him, that he further had a right to an attorney to be present at this time, and that if he was without funds he had the right to have a court-appointed attorney. Q. What was

his response? A. I then asked him if he understood all these rights and he stated yes. Q. What happened next? What was the next thing that was said and who said it? A. He then proceeded to tell me what happened at the accident.

He said that from what the defendant told him he made a written statement as to how the accident happened, and after finishing writing it had Gerry read it over. He told Gerry to make any changes he wished to make in it and that defendant read it, made a correction and initialed the correction. The officer said that, after defendant signed the confession, he was not arrested:

Q. What happened after he signed the statement? A. I then thanked him and told him he was free to go on his way and that he would be advised later by mail, that he would receive a citation.

The defendant left the station house and the police thereafter obtained a warrant for his arrest which was later served on him. The officer said that he made no promise to Gerry. Throughout the interview and interrogation, according to Officer Wood, the defendant seemed to understand everything that was said to him and the language of the written statement was that of the defendant in describing the incident to the officer. It is not remarkable, I think, nor unexpected that, after the officer advised defendant of his rights and he said he understood them and when the officer then asked him if he wished to tell about the accident, he would proceed to tell the officer of the accident.

Thus, except for the production of expert testimony as to defendant's mental capacity and capabilities of comprehending principles of constitutional law, defendant was permitted to and did fully testify concerning the making and signing of the confession. His testimony shows that his confession was entirely voluntary and uncoerced; that he went voluntarily to the precinct station to make out an accident report; that he was never placed under arrest nor detained by process of law or threats of detention while there; that he left the station house and was not arrested until a warrant was subsequently served upon him; and

that he was fully cautioned as to his rights, privileges and immunities under the so-called Miranda rule.

Even the most sophisticated and expansive interpretation of the Miranda doctrine, I think, does not permit a layman to go into the areas of psychiatry and psychology and give opinion as to the subtleties of mind reflecting one's capacity to comprehend the intricacies of constitutional law. I find nothing else in the record which invokes the so-called Miranda rationale or warrants a reversal of this conviction. The findings of fact show that every aspect connected with the voluntariness of defendant's confession was fully considered by the court, and it explicitly found that, after being fully informed, the defendant knowingly, intelligently and voluntarily signed the confession.[1]

---

[1]The court categorically resolved these issues of fact against the defendant in formal findings:

" . . . While at the said Precinct Station, the defendant signed a written statement admitting his involvement in the said collision and the fact that he left the accident scene without stopping. Said statement was given to Officer D. E. Wood of the Seattle Police Department. After giving said statement to Officer Wood, the defendant departed from the police station. At no time was the defendant under arrest while at the said police station and was not in police custody at the time of giving said written statement to Officer Wood. The said statement was offered and admitted into evidence as Plaintiff's Exhibit 1.

"V.

"Prior to any conversation with the defendant concerning the accident and prior to obtaining the latter's signed statement (plaintiff's Exhibit 1), Officer Wood advised the defendant that he did not have to say anything, that anything he said might later be used against him in court, that he was entitled to be represented by counsel and to have counsel with him during any interrogation by the police, and that if he could not afford counsel that counsel would be appointed for him by the court. The defendant thereupon stated that he understood the advice so given and the defendant did, in fact, so understand said advice. The defendant thereupon knowingly, intelligently and voluntarily, waived said rights by discussing the accident with Officer Wood. As a result of the defendant's statement to Officer Wood concerning the accident, Officer Wood prepared a written statement (plaintiff's Exhibit 1) which he gave to the defendant to read. The defendant read said statement, understood the contents thereof, and voluntarily signed the same (Plaintiff's Exhibit 1).

"VI.

"At no time did Officer Wood, or any other officer of the Seattle Police Department, in any way threaten the defendant, or make any

To summarize: The majority assumes something which the record categorically refutes, *i.e.*, that the defendant was under arrest, in custody or restrained. He went voluntarily to the precinct station to do something voluntarily which thousands of his fellow citizens do every year—report an accident. He was never placed under arrest while at the station house and was free to leave at any time, a privilege which he freely exercised.

He testified in detail concerning the making, taking and signing of the confession and was entirely free during the direct, cross and redirect examination on that subject to explain his personal reactions to the whole procedure. He did not claim he was unable to understand what was going on at either the station house or in court. He did not claim mental retardation, mental irresponsibility, insanity, stupidity or a mental state which would render his statements inadmissible because involuntary or coerced, nor did he claim force, fear, threats or improper inducements.

In any event, the purported offer of proof made by counsel in colloquy with the court was insufficient to establish a predicate for reversal. It did no more than suggest that the defendant was of such a mental condition that he did not have a full awareness or capability of understanding his right to counsel—a claim which would not only entitle the prosecution to advance notice in the form of a plea but one which also would call for expert opinion evidence. The offer did not imply that the offer incorporated a promise to produce expert opinion evidence.

Thus, the record itself presents no reversible error. Where the record shows that evidence has been excluded but it is not clear whether it would be competent, relevant and material or otherwise admissible, the court on review will not consider an assignment of error directed to the exclusion unless an offer of proof has been made showing the evidence to have been admissible. *Smith v. Seibly*, 72

promises to the defendant, or in any wise induce the latter to give the signed statement by means of coercion, duress, promises or threats. The said statement in all respects was freely, intelligently and voluntarily given." Findings of fact 4 (in part), 5 and 6.

Wn.2d 16, 431 P.2d 719 (1967); *Cameron v. Boone*, 62 Wn.2d 420, 383 P.2d 277 (1963); *Blood v. Allied Stores Corp.*, 62 Wn.2d 187, 381 P.2d 742 (1963); *State v. Thompson*, 58 Wn.2d 598, 364 P.2d 527 (1961); *State v. Fiddler*, 57 Wn.2d 815, 360 P.2d 155 (1961); and *State v. Williams*, 12 Wn.2d 16, 120 P.2d 502 (1941).

I would, therefore, affirm.

HUNTER, C. J., concurs with HALE, J.