STATE OF HAWAII, Plaintiff-Appellee *v*. GEORGE
PATRICK MURPHY, Defendant-Appellant

NO. 5944

FEBRUARY 21, 1978

RICHARDSON, C.J., KOBAYASHI, OGATA,
MENOR AND KIDWELL, JJ.

2

OPINION OF THE COURT BY OGATA, J.

This is an appeal from a conviction for murder. The defendant-appellant, George Patrick Murphy (hereinafter referred to as appellant), was found guilty by a jury of the murder of Linda K. Knodle. The court below sentenced appellant to life imprisonment with possibility of parole.[1] Upon consideration of all the points raised on this appeal, we affirm the judgment and sentence of the court below.

On the morning of November 26, 1974, the partially clad body of a young woman was discovered in the restroom area of the fourth-floor laundry room of the Waikiki Gateway Hotel. The cause of death was found to have been asphyxia due to strangulation, and there was also evidence of sexual assault. The body was later identified as that of Linda K. Knodle, who had checked into the hotel earlier that morning.

Knodle was last seen alive as she entered one of the hotel's lobby elevators about 20 to 30 minutes after checking in at the front desk. The hotel's assistant manager, Gaylord Komoto, testified that he also saw a male, whom he later identified as appellant, walk into the hotel lobby and get into the same elevator which Linda Knodle entered. However, on cross-examination, Komoto stated that he was only "40% sure" that it was appellant who got into the elevator at the same time as Knodle.

---

[1] A defendant convicted of murder is sentenced under the provisions of HRS § 706-606. HRS § 707-701(2).

4

Police detectives were able to "lift" several latent finger-prints from the scene of the murder, and fourteen of the prints were identified as those of appellant. Appellant admitted having been in the fourth-floor laundry area restroom on the morning of November 26, but he testified that he had only gone there to urinate while walking home from a night out at some Waikiki bars. Appellant's testimony indicated that he used the restroom some time prior to the time that Linda Knodle was seen getting into the hotel elevator.

The State produced additional evidence that appellant had accosted a woman by the name of Karen Cook on a street near the Waikiki Gateway Hotel shortly before 5:00 a.m. on November 26. Cook managed to break away from appellant's grasp and succeeded in running away from him. She stated that she last saw appellant walking away from her in the direction of the Waikiki Gateway Hotel.

## I. PRE-TRIAL MOTION TO DISMISS THE INDICTMENT.

The first question raised by appellant is whether the trial court erred in refusing to grant appellant's pretrial motion to dismiss the indictment. Appellant contends that the grand jury improperly indicted him on the basis of certain hearsay testimony elicited during the grand jury proceeding.

During the course of the grand jury hearing, Honolulu Police Detective Paul Trepte was called to testify regarding his investigation of the Linda Knodle homicide. The grand jury transcript, a copy of which is a part of the record in this case, reveals that Detective Trepte testified, *inter alia,* to the following matters:

(1) When he arrived at the Waikiki Gateway Hotel on the morning of November 26, 1974, he found the body of a partially nude, young woman in the restroom of the hotel launderette, and the woman "was pronounced dead, at the scene"; and

(2) "An autopsy was performed on the woman and the cause of death comes back as 'asphyxia, due to strangula-tion.' "

Based upon the testimony of Trepte and of other witnesses, the grand jury indicted appellant on the charge of murder.[2]

Appellant maintains that because Trepte's testimony as to the fact and cause of death was hearsay, the indictment was improperly returned under the pronouncements of *State v. Layton*, 53 Haw. 513, 497 P.2d 559 (1972).[3] In *Layton*, this Court agreed with the proposition that hearsay evidence in a grand jury proceeding should only be used in certain exceptional situations. Appellant asserts that the exceptions stated in *Layton* do not apply here, and, therefore, the hearsay statements made by Trepte as to the fact and cause of death should not have been considered by the grand jury.

We agree that the testimony of Detective Trepte relating to the fact and cause of death was hearsay.[4] In addition, Trepte's testimony as to the fact and cause of death was crucial to the grand jury's finding that probable cause existed, for no other testimony was presented which would have indicated that Linda Knodle was the victim of a homicide. Therefore, if Trepte's hearsay testimony was impermissible under *Layton*, the indictment should have been dismissed.

We do not regard *Layton* as having established an ironclad prohibition on the use of hearsay testimony in grand jury

---

[2] The indictment reads in part as follows:

... GEORGE PATRICK MURPHY did intentionally or knowingly cause the death of Linda K. Knodle by strangulation, thereby committing the offense of Murder . . . .

[3] Appellant also urges that Trepte's testimony as to the fact and cause of death was improper because the prosecution did not demonstrate compliance with HRS § 836-3 (Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings). However, the record fails to indicate that any potential witnesses were outside the state at the time of the grand jury hearing. The burden is upon the party asserting the error to make it manifest by the record. *State v. Hashimoto*, 46 Haw. 183, 186, 377 P.2d 728, 731-32 (1962). Therefore, because the record fails to indicate that HRS § 836-3 could have been invoked, we decline to consider this portion of appellant's argument.

[4] Both the grand jury transcript and the trial record are unclear as to who in fact "pronounced" Linda Knodle dead. There is no indication that Trepte himself determined that the victim was dead. The determination as to exact cause of death was reached by the Medical Examiner, who was not called to testify at the grand jury hearing.

proceedings. In *Layton,* the court quoted a passage from *United States v. Umans,* 368 F.2d 725, 730 (2d Cir. 1966), which expressed the following:

> Hearsay evidence should only be used [in a grand jury proceeding] when direct testimony is unavailable or when it is demonstrably inconvenient to summon witnesses able to testify to facts from personal knowledge.

53 Haw. at 515, 497 P.2d at 561. Describing the above-quoted passage as an "admonition to prosecutors", the court in *Layton* expressed agreement with it. We are of the opinion, however, that this "admonition" must be viewed as — at most — a policy expression and not as a hard and fast rule, because the court in *Umans* was mainly concerned with "excessive" use of hearsay evidence in grand jury proceedings. Moreover, it was never stated in *Layton* that the effect of *Umans* was to require that an indictment be quashed whenever crucial hearsay evidence is presented to a grand jury absent a showing of necessity. The language of *Layton* fails to indicate that the above-quoted passage was intended to become an absolute rule in Hawaii.

We do agree with the position taken in *Umans* that excessive use of hearsay testimony tends to be destructive of the grand jury's function. *See Umans,* 368 F.2d at 730, *quoted in Layton,* 53 Haw. at 515, 497 P.2d at 561. The preferable practice would be, of course, for the prosecution to present witnesses who are able to testify from first-hand knowledge whenever possible.[5] Nevertheless, where the hearsay testimony was not used deliberately in the place of better evidence to improve the case for an indictment, dismissal of the indictment is not required.

In the instant case there is nothing to suggest that the testimony of Detective Trepte did not accurately reflect the findings of the official autopsy or that there was any improper

---

[5] We recognize that this approach is plainly at variance with the views expressed in both *Jones v. Taylor,* 547 F.2d 808, 809 n. 1 (4th Cir. 1977), and *Commonwealth v. Comins,* —— Mass. ——, 356 N.E.2d 241, 243 (1976), *cert. denied,* 430 U.S. 946 (1977), which took the position that an indictment returned *solely* on the basis of hearsay is not necessarily invalid.

purpose behind the prosecutor's use of hearsay to establish the fact and cause of death.

The grand jury properly considered the hearsay testimony given by Detective Trepte. The motion to dismiss the indictment was properly denied.

## II. EVIDENCE OF PRIOR CRIME

The next point relied upon by appellant is that the trial court erred in allowing witness Karen Cook to testify over objection that appellant had accosted her near the Waikiki Gateway Hotel on the morning of the murder.

Prior to Cook's taking the stand to testify, appellant's counsel moved to have Cook's testimony excluded on the ground that prior acts or offenses of a defendant are inadmissible. In opposing the motion, the prosecution contended that Cook's testimony fell within certain exceptions to the general rule of nonadmissibility of evidence of prior offenses. The trial court denied appellant's motion to exclude Cook's testimony.

Cook testified that she was accosted by appellant, with whom she was theretofore unacquainted, early on the morning of November 26, 1974. On that date, Cook was employed as an airline reservation agent and was slated to begin work at 5:00 a.m. As she was walking to work at about 4:50 a.m. a male walked up to her, grabbed her by the arm, and asked her where she was going and what she was doing. The assailant also grabbed her around the neck with one hand. Cook managed to break away from her assailant's grasp and succeeded in escaping from him. She last saw the male walking away from her in the direction of the Waikiki Gateway Hotel, which was located about one or two blocks from where she was accosted. At a police lineup and later at trial, Cook identified appellant as the man who had accosted her.

Appellant relies upon the generally stated rule that evidence which reveals that a defendant has committed crimes other than the one for which he is on trial is ordinarily inadmissible. *Territory v. Caminos,* 38 Haw. 628, 635 (1950).

In *State v. Iaukea,* 56 Haw. 343, 537 P.2d 724 (1975), we noted the difficulties which may arise when evidence is introduced which tends to prove the commission of crimes other than those with which the defendant is charged. We went on to discuss in *Iaukea* the two basic formulations of the rule pertaining to use of evidence involving other crimes. Under the first formulation, which encompasses a more liberal approach, evidence of other crimes is deemed to be admissible if it is found to be relevant and to have a tendency to establish the offense charged. The second (or "alternative") formulation, which is most often recited by courts around the country, is the more restrictive view that evidence of other crimes is inadmissible except when it helps to establish one of five issues: intent, motive, absence of mistake or accident, identity, or common scheme or plan. While these five traditional exception categories are not intended to be exhaustive, courts which follow the alternative approach are usually reluctant to admit evidence of other crimes which does not fall within those categories.

We chose in *Iaukea* to base our decision regarding admissibility of the evidence of other crimes upon an analysis which independently utilized each of the above formulations. While we acknowledged that use of a combination of formulations had been criticized,[6] we were reluctant in *Iaukea* to rely upon one approach to the exclusion of the other. However, we continue to believe in the soundness of the method of analysis undertaken in *Iaukea.*

Turning to the facts of the instant case, it is fairly simple under the liberal approach to determine that the trial court did not err in admitting the testimony of Karen Cook. The evidence elicited through Cook's testimony was relevant in placing appellant close in time and place to the scene of the murder. Appellant's testimony in effect set up the alibi that he was at home at the time that Linda Knodle was murdered. He testified that he got home "around 4 or 5" in the morning of November 26th. Although the State's witnesses were not in

---

[6] *See Stone, The Rule of Exclusion of Similar Fact Evidence: America,* 51 Harv.L.Rev. 988, 1037 (1938).

agreement as to the exact time that Linda Knodle arrived at the hotel, their testimony indicated that Knodle got into the hotel elevator sometime between 5:00 and 5:30 a.m. We need not go further to conclude that the testimony of Karen Cook was necessary to place appellant in the vicinity of the Waikiki Gateway Hotel shortly before Linda Knodle was murdered. Cook's testimony was necessary in countering appellant's alibi.[7]

The next step under the liberal approach is to determine whether the evidence that appellant accosted Karen Cook was so highly prejudicial as to outweigh its probative value. The following overall considerations must be taken into account in making this determination:

> [The problem is] one of balancing, on the one side, the actual need for the other-crimes evidence in light of the issues and the other evidence available to the prosecution, the convincingness of the evidence that the other crimes were committed and that the accused was the actor, and the strength or weakness of the other-crimes evidence in supporting the issue, and on the other, the degree to which the jury will probably be roused by the evidence to overmastering hostility.

McCormick on Evidence, *supra,* §190 (footnotes omitted).

In *State v. Hockings,* 29 Or. App. 139, 562 P.2d 587 (1977), the court found after considering these factors that because of the circumstantial nature of the evidence connecting the defendant with the murders, "it was of primary importance to place the defendant near the crime scene at the critical time." 29 Or. App. at ———, 562 P.2d at 591. The court further felt that the weight attaching to testimony proving the links in the chain of circumstantial evidence was of critical importance. Therefore, the need for revealing the

---

[7] If the jury believed Cook's testimony that appellant had accosted her at 4:50 a.m., it could have concluded that it would have been almost impossible for appellant to subsequently go over to the hotel, use the restroom on the fourth floor, and then walk and hitchhike his way from Waikiki in time to be at his home on Dole Street by 5:00 a.m. Cook's testimony thus served to seriously weaken appellant's alibi that he was home by 4:00 or 5:00 a.m.

background circumstances surrounding the witness's association with the defendant was deemed to be crucial in order to establish the witness's believability. The need for such explanatory evidence was held to outweigh any possible prejudicial effect.

The evidence linking appellant to the murder of Linda Knodle was likewise entirely circumstantial. It was thus necessary for the State to show that appellant was not at home but was near the Gateway Hotel shortly before Linda Knodle and a male were seen entering the same elevator. In order to provide credibility to witness Cook's testimony, it was necessary for the State to reveal the full circumstances of Cook's confrontation with appellant. The need for this evidence was not outweighed by any prejudicial effect, and Karen Cook's testimony was, therefore, properly admitted under the liberal approach by the trial court.

Under the second approach, Cook's testimony fits into the general category of identity. The instant case is very similar to *State v. Thompson*, 58 Wash.2d 598, 364 P.2d 527 (1961), *cert. denied*, 370 U.S. 945, *reh. denied*, 371 U.S. 855 (1962), in which the defendant was convicted of the murder of a woman. During the course of the defendant's trial, an eleven-year-old girl was allowed to testify that the defendant had seized her on the street and tried to rape her. The assault had taken place shortly after the time that the defendant allegedly committed the murder. Also, the girl's testimony indicated that the assault had taken place some three blocks from the location where the murder allegedly occurred.

On appeal, the defendant contended that the introduction of the evidence of the other crime (assault) constituted reversible error. The Supreme Court of Washington disagreed, holding that the testimony of the young girl "established the *identity* of the person who was in the neighborhood of the crime charged, . . . ." 58 Wash.2d at 604-05, 364 P.2d at 531 (emphasis added). The court thus deemed that the evidence was properly admitted to establish identity, and it refused to reverse the conviction for murder.

In the instant case, Karen Cook's testimony likewise helped to establish appellant's identity as the "person in the

neighborhood of the crime charged."[8] The evidence thus fell into the identity exception to the rule that evidence of other crimes is generally inadmissible.[9]

Karen Cook's testimony was properly admitted by the trial court.

### III. TRIAL COURT'S INSTRUCTION TO JURY REGARDING PRIOR CRIME

Appellant next contends that the trial court erred in giving Defendant's Requested Instruction No. 23, which, as modified, became Instruction No. 21, to the jury. The instruction reads as follows:

> Evidence has been introduced tending to show that the defendant may have committed an earlier act regarding a witness, Karen Cook. Such evidence of an earlier act does not in any way prove that a later act was committed or if committed was done by the same person and therefore, such evidence of an earlier act is not to be considered by you for any purpose unless you first find from the other evidence in the case and beyond a reasonable doubt that the defendant did the particular act charged here.

---

[8] Although the other offense in *Thompson* occurred subsequent to the offense charged, we are of the opinion that a determination of the admissibility of evidence of such other offenses should not turn on whether the other offenses took place prior to or subsequent to the offense charged.

[9] Courts in Illinois elaborate on the identity exception by holding that evidence of other crimes is also admissible if it tends to merely show the presence of the accused at or near the scene of the crime when an alibi is set up as a defense. *People v. Davis,* 14 Ill.2d 196, 151 N.E.2d 308 (1958); *People v. Harper,* 49 Ill. App.3d 407, 364 N.E.2d 402 (1977); *People v. Castillo,* 40 Ill. App.3d 413, 352 N.E.2d 340 (1976). The similarity of this view with the result reached in *Thompson* ("identity of the person in the *neighborhood* of the crime charged") seems apparent. While we do not feel it necessary to adopt the approach taken by these Illinois courts in view of our reliance today upon the *Thompson* case, it is clear that Karen Cook's testimony was equally admissible under the Illinois approach. Appellant's testimony indicated that he was at home by the time that Linda Knodle could have been murdered. Cook's testimony thus served to place appellant near the scene of the murder close to the time that appellant stated he was at home, thereby countering appellant's alibi. Cook's testimony was thus admissible under the Illinois view.

If you should find beyond a reasonable doubt on the other act [*sic*] that the defendant did the act now charged, then you may consider the evidence as to an alleged earlier act *of a similar nature* in determining the state of mind or intent with which the defendant did the more recent act *or his identity as the perpetrator of the later act,* bearing in mind that the specific intent with which ·the defendant is now charged *and his identity* must be established beyond a reasonable doubt. [Emphasis added.]

As indicated, this instruction was originally requested by appellant. The portions emphasized above represent the trial court's additions, which were inserted over the objection of appellant's counsel. Appellant contends that the added portions were incorrect and misleading. We disagree.

First, the added portion referring to acts "of a similar nature" served to narrow the scope of the kind of prior acts which the jury was entitled to consider. Rather than misleading the jury into thinking that the prior act and the crime charged were necessarily similar offenses, we believe that the phrase would have prompted the jury to consider the evidence of the prior act only if the jury first regarded the act to be similar in nature to the offense charged. Therefore, the phrase "of a similar nature" actually served to protect the interests of appellant, and its inclusion in the instruction was not erroneous.

There was no impropriety in the trial court's addition of the portions relating to identity. Karen Cook's testimony was admissible to establish the identity of the person who was in the neighborhood of the crime charged. *See State v. Thompson, supra.* The instruction properly limited the jury's consideration of Cook's testimony to this particular purpose.

Therefore, there was no error in the giving of Instruction No. 21 to the jury.

### IV. TESTIMONY OF FINGERPRINT COMPARISONS EXPERT

The next issue is whether the trial court erroneously allowed Honolulu Police Sergeant Francis Williams, a finger-

print comparisons expert, to testify to matters beyond the scope of Williams's expertise. Williams was permitted to state several conclusions based upon his inspection of appellant's latent fingerprints, which were found on the toilet seat cover and around the top edge of the bathtub at the scene of the murder. Appellant does not quarrel with Williams's qualifications as a fingerprint comparisons expert. However, appellant maintains that the testimony objected to went to matters beyond the scope of Williams's expertise in comparing and identifying fingerprints.

The following items of opinion testimony given by Williams were objected to by appellant:

(1) The various positions which appellant's hands were in at the time that his latent finger- and palmprints were impressed on the bathroom surfaces.[10]

(2) The determination that some of the latent finger- and palmprints were impressed simultaneously, or in one motion, and, therefore, were made by the same hand.

(3) The comparative degree of pressure applied by appellant when the latent prints were impressed,[11] thereby giving rise to two further conclusions by Williams:

(a) Appellant was "apparently trying to pull himself forward at the time the prints were impressed"; and

(b) Appellant's body was "fairly low in relation to the floor" at that time.

(4) Appellant's arm was in an extended, horizontal

---

[10] In order to make this determination, Williams matched the latent digital and partial palmar prints found at the scene of the murder with the appropriate digital or palmar areas on appellant's life-size handprints taken at the police station.

[11] This opinion was based on a comparison of the width of the latent fingerprints found at the murder scene with the width of inked impressions of the same fingers taken from appellant at the police station.

position at the time that some of the prints along the top edge of the bathtub were made.[12]

We find that with regard to items (1) and (2) above, no error was committed by the trial court when it allowed Sgt. Williams to testify to the matters relating thereto. The court concluded that based upon Williams's training and experience, he was an expert qualified to give those opinions. The determination of whether or not a witness qualifies as an expert is a question for the trial court to determine. *Bulatao v. Kauai Motors, Ltd.,* 49 Haw. 1, 13, 406 P.2d 887, 893-94 (1965). Moreover, the general rule is that admissibility of expert testimony is a matter within the broad discretion of the trial judge, and his decision will not be overturned on appeal unless manifestly erroneous or clearly an abuse of discretion. *United States v. Bolts,* 558 F.2d 316, 322 (5th Cir. 1977); *United States v. Cyphers,* 553 F.2d 1064, 1072 (7th Cir. 1977); *People v. Stapelton,* 4 Ill.App. 3d 477, 480, 281 N.E.2d 76, 78-79 (1972). We are of the opinion that the trial judge could rightfully have found that the opinion testimony relating to the positions of appellant's hands at the time the latent finger- and palmprints were made, as well as the fact that certain prints were impressed simultaneously by the same hand, fell within the scope of Williams's expertise in comparing and identifying fingerprints and palmprints. There was no error of law or abuse of discretion on the part of the trial judge with regard to items (1) and (2) above.

With respect to items (3) and (4), appellant forwards the additional argument that this evidence was prejudicial and inflammatory.[13] He contends that the evidence tended to suggest to the jury that he was in a prone position on top of the victim and was engaged in the act of rape or about the time

---

[12] This conclusion apparently resulted from a finding of "wrist creases" on some of the palmprints found along the top edge of the bathtub. Williams concluded from these creases that appellant's arm must have been in a flat, or horizontal, position when the latent palm impressions were made.

[13] As far as we can tell from the record, this proposition was not mentioned by appellant at trial. In addition, it was not argued in the briefs before us but was asserted only during the course of oral argument.

that the prints were made. Although we find it somewhat difficult to agree with the trial court that Sgt. Williams was qualified to give the opinions referred to in items (3) and (4), we find that the evidence was, in any event, not prejudicial to appellant.

Williams's opinion testimony merely indicated that appellant's body was "fairly low in relation to the floor" and that appellant was trying to "pull himself forward" at the time that the prints were impressed on the bathroom surfaces. There was no testimony whatsoever that appellant had been in a "prone position". Williams's testimony was actually supportive of appellant's claim at trial that he either had bent over or had squatted to remove one of his sandals in the bathroom, and, in doing so, may have lost his balance. Appellant's testimony indicated that in order to regain his balance, he may have stretched his arms out and pulled himself forward by grabbing onto the bathtub. Thus, more than anything else, Williams's testimony was consistent with appellant's own claims regarding what took place.

It would be overly speculative to conclude from this evidence that appellant was in a prone position on top of the victim and was thus engaged in the act of rape at or about the time the latents prints were made. We hold that the trial court's error, if any, in allowing Sgt. Williams to testify with regard to items (3) and (4) was non-prejudicial to appellant. Assuming that Sgt. Williams was not qualified to give this testimony, the entire record leads us to believe that the jury could not reasonably have returned a verdict other than the one it did, even if the incompetent testimony had not been admitted. See State v. Hashimoto, 46 Haw. 183, 377 P.2d 728 (1962).

### V. ADMISSION OF DEMONSTRATIVE EVIDENCE.

In conjunction with his testimony relating to the positions which appellant's hands were in at the time certain finger- and palmprints were made, Sgt. Williams was allowed to utilize an actual-size diagram of the bathroom where the murder occurred. Props representing the exact height and

location of the toilet seat and the top edge of the bathtub were placed in the appropriate locations on the diagram. Sgt. Williams was then permitted to place several life-size handprint impressions, which were taken from appellant, upon those areas on the props where latent finger- and palmprints were found in the actual bathroom.

Appellant's counsel objected to this representation of the position of appellant's hands at the time the prints were made. Appellant contends that the display was inaccurate and misleading because it tangibly reflected the opinions of Sgt. Williams, whose testimony appellant states was premised upon guesswork and was beyond the scope of Williams's expertise. We have already disposed of this argument by deciding that the trial court properly found this opinion testimony to be within the scope of Williams's expertise. Appellant's objection to the display has thus lost whatever vitality it may have had.

### VI. HEARSAY TESTIMONY OF GAYLORD KOMOTO.

Appellant next asserts that the trial court erred in admitting, over objection, certain hearsay testimony of Gaylord Komoto, assistant manager of the Waikiki Gateway Hotel. Komoto was allowed to testify as to the location where the hotel's maintenance supervisor discovered the room key which had been issued to the victim. The room key was found by the maintenance supervisor in the fourth floor hallway of the hotel and was returned to Komoto by the supervisor approximately an hour-and-a-half after Komoto had given the key to the victim at the front desk.

Komoto's testimony purported to relate an account of what the maintenance supervisor told him and was offered to show the truth of the supervisor's statement. Therefore, it is apparent that Komoto's testimony in this regard was hearsay, see McCormick on Evidence, supra, §247, and the trial court erred in permitting Komoto to testify as to where the key was found.

However, we are of the opinion that this error was harmless. Appellant has not pointed out to us what prejudicial

inferences might have been drawn by the jury from the fact that the room was found in the fourth floor hallway. Since the victim's body was found in the fourth floor washroom, evidence of her presence in the fourth floor hallway did not add to the case against appellant. We are unable to attribute any other probative effect to this testimony. Thus, the record as a whole reveals no prejudice from the erroneous admission of the evidence, and reversal is not warranted. *See Lyon v. Bush*, 49 Haw. 116, 123, 412 P.3d 662, 667 (1966); *State v. Hashimoto, supra*, 46 Haw. at 189, 195-96, 377 P.2d at 733, 736.

### VII. TRIAL COURT'S REFUSAL TO ALLOW TESTIMONY RELATING TO ALLEGED BIAS OF GAYLORD KOMOTO.

We must next consider whether the trial court erred in refusing to allow defense witness David Kupele to testify regarding his attempt to interview Gaylord Komoto. Appellant's offer of proof indicated that Kupele, an investigator for the Public Defender's Office, would have testified that he attempted to interview Komoto at the Waikiki Gateway Hotel and that Komoto refused to talk to Kupele about this case. Appellant contends that Komoto's refusal to discuss the case with Kupele tended to show bias on the part of Komoto in favor of the prosecution.

The general rule is that a witness may be impeached through a showing of bias, hostility or prejudice, and this may be done by use of the witness's own testimony or by other evidence. *Territory v. Yadao*, 35 Haw. 198, 202 (1939). Appellant argues that under *Territory v. Yadao*, the trial court was required to admit Kupele's testimony relating to Komoto's alleged bias. The State maintains that the trial court did not err because the defense failed to lay a proper foundation for the introduction of the evidence of alleged bias. We agree with the State's position.

Although *Yadao* seems on first reading to have implicitly given approval to the introduction of evidence of bias absent the laying of any foundation, there is no indication that the foundational issue was actually considered by the Court in

that case. We find that *Yadao* is not, therefore, determinative of the question. We believe that the correct rule is stated in *State v. Shaw,* 93 Ariz. 40, 378 P.2d 487 (1963) (en banc), which followed the majority position that before any bias of a witness can be introduced, a foundation must first be laid by cross-examining the witness regarding the facts which assertedly prove the bias.[14] Two reasons were recognized by the court in *Shaw* for such a preliminary foundation. First, the foundational cross-examination gives the witness a fair opportunity to explain statements or equivocal facts which, standing alone, tend to show bias. Second, such cross-examination lends expediency to trials, for if the facts showing bias are admitted by the witness, the introduction of extrinsic evidence becomes unnecessary.

The *Shaw* case also added a degree of flexibility to the foundational rule by providing that if a trial court finds itself satisfied that fairness will be maintained, it has discretion to dispense with the foundational cross-examination requirement when "exceptional circumstances would make it unduly burdensome to require it . . . ." 93 Ariz. at 44, 378 P.2d at 489.[15]

We are fully satisfied with the soundness of the rule set out in *Shaw*. Therefore, we hold that the trial court did not err in refusing to admit the testimony of David Kupele regarding the alleged bias of Gaylord Komoto. The transcript reveals that Komoto was never cross-examined about his refusal to talk to Kupele about the case. Furthermore, we are aware of no exceptional circumstances which would have made it unduly burdensome to require the preliminary cross-examination of Komoto.

---

[14] This rule was recently reiterated in these cases: *United States v. Harvey,* 547 F.2d 720 (2d Cir. 1976); *People v. Terranova,* 49 Ill. App.3d 360, 364 N.E.2d 357 (1977); *People v. Jones,* 75 Mich. App. 261, 254 N.W.2d 863 (1977); *State v. Akridge,* 23 Or. App. 633, 543 P.2d 1073 (1975).

[15] Such exceptional circumstances may exist where, for example, matters of "indisputable relationship, such as kinship, are concerned, or where the foundation was overlooked and it is not feasible to recall the witness . . . ." McCormick on Evidence, *supra,* §40.

## VII. TRIAL COURT'S DENIAL OF APPELLANT'S MOTION FOR JUDGMENT OF ACQUITTAL.

We now turn to appellant's contention that the trial court erroneously denied appellant's motion for judgment of acquittal made at the end of the prosecution's case.

Appellant maintains that the State's fingerprint and eyewitness identification evidence merely served to place him at the scene of the crime and did not prove that he actually committed the murder. We have herein recognized that the evidence linking appellant to the murder was entirely circumstantial. Of course, it is elementary that a criminal case may be proven beyond a reasonable doubt on the basis of reasonable inferences drawn from circumstantial evidence. *Rudolph v. State,* 78 Wis.2d 435, 254 N.W.2d 471 (1977); *People v. Ingram,* 60 Cal. App.3d 722, 131 Cal. Rptr. 752 (1976); *Luker v. State,* 552 P.2d 715 (Okla. Crim. 1976).

The test to be applied in determining whether the prosecution has presented evidence sufficient to withstand a motion for acquittal is as follows:

> [A] trial judge, in passing upon a motion for directed verdict of acquittal, must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt.

*State v. Rocker,* 52 Haw. 336, 346, 475 P.2d 684, 690 (1970), *quoting Curley v. United States,* 160 F.2d 229, 232 (D.C. Cir.), *cert. denied,* 331 U.S. 837 (1947). To quote further from *Curley v. United States, supra,* regarding motions for acquittal:

> [I]f there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion must be granted. If . . . [the trial judge] . . . concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, he must let the jury decide the matter. In a given case, particularly one of circumstantial evidence, that determination may

depend upon the difference between pure speculation and legitimate inference from proven facts.

160 F.2d at 232-33.

The court below implicitly found that a prima facie case had been established and that a reasonable mind could fairly conclude that, based upon the prosecution's evidence, appellant was guilty of murder beyond a reasonable doubt. After a careful review of the evidence, we are satisfied that the prosecution's evidence did not represent a case of "pure speculation", and the action of the trial court in allowing the jury to "draw justifiable inferences of fact" from the evidence presented by the prosecution did not constitute error. *Rocker, supra.* There was substantial evidence to support the verdict, and we decline to reverse the conviction on this ground. *See State v. Chong,* 52 Haw. 226, 230, 473 P.2d 567, 570 (1970); *State v. Kahunahana,* 48 Haw. 384, 390, 402 P.2d 679, 682-83 (1965).

## IX. TRIAL COURT'S CONSIDERATION OF CERTAIN ARREST REPORTS IN SENTENCING APPELLANT.

Lastly, appellant urges us to overturn the sentence of life imprisonment imposed by the court below. It appears that the sentencing court, in determining the sentence to be imposed, gave consideration to two police arrest reports relating to appellant's prior arrests for burglary and harassment. Appellant argues that the sentencing court was not entitled to consider these arrest reports for two reasons: first, the arrest reports were not contained in the pre-sentence report compiled by the Adult Probation Office, and, second, appellant was denied the opportunity to examine and controvert the arrest reports.

With respect to the first ground of argument, appellant maintains that HRS § 706-604 implicitly requires that the sentencing judge may consider only those matters contained in the pre-sentence report when determining the sentence to

be imposed upon a defendant.[16] We can find no indication, based upon a reading of HRS § 706-604 and the Commentary corresponding thereto, that the Legislature intended to restrict a sentencing judge solely to the use of data contained within the pre-sentence report. Moreover, such a view would run counter to the established policy that "[h]ighly relevant — if not essential — to . . . [the judge's] . . . selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Williams v. New York*, 337 U.S. 241, 247, *reh. denied,* 337 U.S. 961, *reh. denied,* 338 U.S. 841 (1949). If the existence of pertinent and helpful information comes to the attention of the sentencing judge, he should not be required to disregard it on the mere formality that it is not contained in the pre-sentence report. We conclude that the sentencing court is not limited to any particular source of information in considering the sentence to be imposed upon a defendant.

With regard to the second ground of argument, it is clear from the record that appellant and his counsel were given an opportunity to go over the arrest reports at the sentencing hearing, at which time appellant denied the statements contained in the reports.[17] Furthermore, neither appellant nor

---

[16] HRS § 706-604 provides as follows:

*Opportunity to be heard with respect to sentence; notice of pre-sentence report; opportunity to controvert or supplement; transmission of report to department.* (1) Before suspending or imposing sentence, the court shall afford a fair opportunity to the defendant to be heard on the issue of his disposition.

(2) The court shall furnish to the defendant or his counsel and to the prosecuting attorney a copy of the report of any pre-sentence diagnosis or psychiatric or other medical examination and afford fair opportunity, if the defendant or the prosecuting attorney so requests, to controvert or supplement them.

(3) If the defendant is sentenced to imprisonment, a copy of the report of any pre-sentence diagnosis or psychiatric or other medical examination shall be transmitted forthwith to the department of social services and housing or, when the defendant is committed to the custody of a specific institution, to such institution.

[17] The record contains the following discourse between the sentencing court and appellant's counsel, Mr. Worth:

THE COURT: Mr. Worth, the Court has procurred [*sic*] from the Prosecutor's Office a copy of the Arrest Report relating to that burglary, and

his counsel asserted during the sentencing proceedings that appellant was being denied the opportunity to fully and fairly examine and controvert or supplement the reports. Therefore, we find appellant's second ground of argument to be without merit.

No prejudicial error appearing in the record, the sentence of life imprisonment imposed by the court below will not be overturned.

Affirmed.

*Ronald M. Yonemoto,* Deputy Public Defender, for Defendant-Appellant.

*Kendall C. S. Wong,* Deputy Prosecuting Attorney, for Plaintiff-Appellee.

---

attached to it is the report relating to the Harassment. Would you like to read it?
    MR. WORTH: Yes, we would.
    THE COURT: Madam Clerk, will you hand this to the defense counsel?
    MR. WORTH: Thank you, your Honor.
    (BRIEF PAUSE HAD IN THE PROCEEDINGS.)
    MR. WORTH: We've had an opportunity to go over these two arrest reports, your Honor. The defendant denies the statements contained in these reports.