83 P.3d 744

STATE of Hawai'i, Plaintiff–Appellee,

v.

Margaret H. KAHAWAI, Defendant–Appellant.

No. 25101.

Intermediate Court of Appeals of Hawai'i.

Dec. 17, 2003.

**482**

Joyce K. Matsumori–Hoshijo, Deputy Public Defender, on the briefs for Defendant–Appellant.

Jason M. Skier, Deputy Prosecuting Attorney, County of Hawai'i, on the briefs for Plaintiff–Appellee.

BURNS, C.J., and FOLEY, J.; with LIM, J., dissenting.

Opinion of the Court by BURNS, C.J.

Defendant–Appellant Margaret H. Kahawai (Margaret) appeals from the family court's April 16, 2002 Judgment convicting her of three counts of Violation of an Order for Protection, Hawaii Revised Statutes (HRS) § 586–11 (2002). We affirm in part, vacate in part, and remand with instructions.

The family court's Order for Protection, entered on July 3, 2001, ordered that Margaret "not enter or remain within 300 yards of any home or shelter where the other party is staying on a temporary basis." "[T]he other party" was Margaret's ex-husband, Chanley Kahawai (Chanley).

On April 12, 2002, a bench trial was held. Judge Terence T. Yoshioka decided that Margaret knowingly violated the July 3, 2001 Order for Protection by visiting Chanley's home twice on October 11, 2001 and once on October 12, 2001. The Judgment sentenced Margaret to probation for two years, subject to the following special terms and conditions:

1. To attend a domestic violence intervention program as recommended by her Probation Officer and approved by the court and to pay the fees and costs for it.

2. To pay a Criminal Injuries Compensation fee of $150.00 and a probation fee of $150.00.

3. That Margaret "shall obtain a substance abuse assessment from a qualified evaluator selected by [her] Probation Officer and to faithfully and regularly undertake the course of treatment, if any, recommended by the assessment until [she is] clinically discharged within 14 days."

4. That Margaret "shall submit [herself] to random testing for drugs and/or for alcohol within three (3) hours after [her] Probation Officer has requested such testing. [She] will be considered to have tested positive for the substance which the Probation Officer referred [her] for testing if [she] fail[s] to the take the test. [She] shall always have with [her] sufficient monies to pay for the testing."

5. That Margaret "shall not use any narcotic drugs or controlled substances without first obtaining a prescription for such drugs or substance."

6. To comply with the reasonable instructions of her probation officer.

7. To comply with all existing court orders.

## POINT ON APPEAL

Margaret contends that the court erred in imposing special conditions "3," "4," and "5" quoted above. Margaret argues that the court was not authorized to impose these special conditions because they were not, as required by HRS § 706–624(2) (1993), reasonably related to the factors set forth in HRS § 707–606 (1993).

## RELEVANT STATUTES

HRS § 706–601 (Supp.2002) states, in relevant part, as follows:

**Pre-sentence diagnosis and report.** (1) Except as provided in subsections (3) and (4), the court shall order a pre-sentence correctional diagnosis of the defendant and accord due consideration to a written report of the diagnosis before imposing sentence where:

(a) The defendant has been convicted of a felony; or

(b) The defendant is less than twenty-two years of age and has been convicted of a crime.

(2) The court may order a pre-sentence diagnosis in any other case.

(3) With the consent of the court, the requirement of a pre-sentence diagnosis may be waived by agreement of both the defendant and the prosecuting attorney.

HRS § 706–604 (1993) states, in relevant part, as follows:

**Opportunity to be heard with respect to sentence; notice of pre-sentence report; opportunity to controvert or supplement; transmission of report to department.** (1) Before imposing sentence, the court shall afford a fair opportunity to the defendant to be heard on the issue of the defendant's disposition.

(2) The court shall furnish to the defendant or the defendant's counsel and to the prosecuting attorney a copy of the report of any pre-sentence diagnosis or psychological, psychiatric, or other medical examination and afford fair opportunity, if the defendant or the prosecuting attorney so requests, to controvert or supplement them.

(3) In all circuit court cases, the court shall afford a fair opportunity to the victim to be heard on the issue of the defendant's disposition, before imposing sentence. The court, service center, or agency personnel who prepare the pre-sentence diagnosis and report shall inform the victim of the sentencing date and of the victim's opportunity to be heard.

HRS § 706–606 states, in relevant part, as follows:

**Factors to be considered in imposing a sentence.** The court, in determining the particular sentence to be imposed, shall consider:

(1) The nature and the circumstances of the offense and the history and characteristics of the defendant;

(2) The need for the sentence imposed:

(a) To reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense;

(b) To afford adequate deterrence to criminal conduct;

(c) To protect the public from further crimes of the defendant; and

(d) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

HRS § 706–624(2) states, in relevant part, as follows:

(2) Discretionary conditions. The court may provide, as further conditions of a sentence of probation, to the extent that the conditions are reasonably related to the factors set forth in section 706–606 and to the extent that the conditions involve only deprivations of liberty or property as are reasonably necessary for the purposes indicated in section 706–606(2), that the defendant:

. . . .

(i) Refrain from use of alcohol or any use of narcotic drugs or controlled substances without a prescription;

. . . .

(k) Undergo available medical, psychiatric, or psychological treatment, including treatment for drug or alcohol dependency, and remain in a specified institution if required for that purpose;

. . . .

(m) Submit to periodic urinalysis or other similar testing procedure[.]

### STANDARD OF REVIEW

 "The authority of a trial court to select and determine the severity of a penalty is normally undisturbed on review in the absence of an apparent abuse of discretion or unless applicable statutory or constitutional commands have not been observed." *Barnett v. State,* 91 Hawai'i 20, 26, 979 P.2d 1046, 1052 (1999) (citations and internal quotation marks omitted). In other words,

while a sentence may be authorized by a constitutionally valid statute, its imposition may be reviewed for plain and manifest abuse of discretion.

Admittedly, the determination of the existence of clear abuse is a matter which is not free from difficulty[,] and each case in which abuse is claimed must be adjudged according to its own peculiar circumstances. Generally, to constitute an abuse[,] it must appear that the court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.

*State v. Kumukau,* 71 Haw. 218, 227–28, 787 P.2d 682, 688 (1990) (citations and internal quotation marks omitted).

*State v. Gaylord,* 78 Hawai'i 127, 144, 890 P.2d 1167, 1184 (1995).

## BACKGROUND

On April 12, 2002, Chanley testified for Plaintiff Appellee State of Hawai'i (the State) as follows:

Q: And how do you know Margaret Kahawai?

A: I was married to her for 17 years.

Q: Have you ever obtained a restraining order?

A: Yeah. When we came to Court, we had a mutual restraining order, means no contact, no phone calls were permitted. And we were supposed to be away from each other.

. . . .

Q: Mr. Kahawai, drawing your attention to October 11th of 2001, on that date did you have occasion to see Margaret Kahawai?

A: Yeah, it was that Wednesday, that Wednesday when I came home from work. She came to my dad's house. And she came that morning—

. . . .

Q: When you say that morning, about what time?

A: About 11:00, 11:30. And then—

Q: And what happened?

A: She came there. She wanted money. She was harassing.

. . . .

Q: By harass, what exactly do you mean?

A: Harass means, well, you know, that she wanted money from me, money that she put into my daughter's savings account. And I told her that, you know, I no longer support you anymore. And I didn't stay too long, so I left. I just went out for a while. And then about an hour and a half later I came back, and then she came back again. Same thing over and over.

Q: And that second time when she came back—

A: She came back to the residence.

Q: —what exactly happened?

A: Same thing. She came back, harass me, she wanted money. She wanted money what she put into my daughter's savings account. And I told her no.

Q: And that second time when she came there, were you inside the house or outside of the house?

A: No, I heard her again, and then I came out again. And then I told her, you know, you're not supposed to be—you're not supposed to be over here because we have a restraining order. But no matter what you tell her, it doesn't phase her, you know. And so, that second time I left. . . .

Q: Okay. When was the next time you saw Margaret Kahawai again after that?

A: A day and a half after that, Friday afternoon. Friday afternoon when I was going to work, Jack's, in the afternoon.

Q: About what time?

A: About 4:00 o'clock. And that's the weekend that my father-in-law took my daughter home for the weekend because they have visitation, two days' visitation. So that's the weekend when my daughter went home with the granddaughter, she went home. And that's when I came home. I was getting ready to work in the afternoon. Then she came back again for the third time. See, the first two times, I never call. The third time was when I did something.

Q: And the third time that she came to see you-

A: I didn't say nothing. She just came, she was parked across the street, across from my dad's house . . .

. . . .

Q: And what happened during that encounter?

A: Then I just jumped in my truck and then I was leaving. And then the same time, she was climbing up back on my truck. So the same time, that's when I call the police department. I used my cell phone.

. . . .

Q: Did she say anything to you before she got in the back of the truck?

A: Yeah, that she wanted money. And I didn't say anything. . . .

Q: And did she—

A: And then when I turned on Leilani Street to go Hinano, she jumped off. . . .

Q: So how long was that that [sic] she was in the back of your truck?

A: About like, around 20 minutes, half hour. . . .

Q: Now on Wednesday, she came about 11:30. And when you finally came out-you came out to meet her outside, right? And that's when she asked you for the money that was remaining in the child, your daughter's—

A: Savings account.

Q: —savings account. Before this day you had-there was a thousand dollars, right, that she had deposited into your daughter's account, true?

A: Right.

. . . .

Q: So you had released, or you had the bank write her out a check for 750.

A: Uh-huh.

Q: But you didn't release the whole thousand dollars that she had put in there.

A: When she put that money into that account—

Q: Is that true or not true?

. . . .

A: It's true.

Margaret testified and explained why she violated the temporary restraining order.

A: I deposited thousand dollars in American savings.

The Court: Uh-huh.

A: And he only gave me back 750. But that was money that's supposed to—Shalissa, my baby's supposed to have brought over her sister from the mainland. I put it in Shalissa's account so she could go to the travel agent and think that she was bringing home her sister. That's why I put the money in there.

. . . .

Q: Did your husband make any statements to you about the money?

A: He told me he was gonna give me them [sic] back.

Q: Okay. Then he left, right?

A: Uh-huh.

. . . .

Q: You thought your husband was gonna go get the money.

A: That's why I came back.

Q: Okay. After he left, what did you do?

A: I waited little while. And I don't remember if I left . . . but—yeah. And then we came back and I thought he had the money. And he still never had the money, so I left.

. . . .

Q: Okay. Did you approach him after he came back?

A: Yes.

Q: About what?

A: About the money, if he got them. I assumed that he went to the bank.

Q: And did you get any money?

A: No. No.

Q: And then what happened when you found out—

A: Then I left. But we weren't arguing. I just left, yeah. I just asked him, he told me no. Then I came back on Friday.

. . . .

Q: And again, why did you go back?

A: Asking for the money. I really needed it. When he left, he took everything, down to toilet paper and all. . . . He left me bone dry. I wanted my money back.

After all of the evidence was presented, the following was stated, in relevant part, as follows:

THE COURT: . . . .

Now, notwithstanding what the purpose of your contact was, it still constitutes a violation of the order for protection, okay, because you knowingly went there in violation of that order. . . .

. . . .

So, [Margaret], the Court has no option, you know, but to find you guilty of the offense of a violation of an order for protection. With respect to three counts, Court finds you guilty of all three counts of violation of an order for protection.

. . . .

With respect to sentencing, would you like to have a presentence investigation conducted before the Court passes sentence? We can have someone do a presentence investigation and make recommendations as to what the sentence should be.

[COUNSEL FOR MARGARET]: Judge, [Margaret] does not require one.

The State recommended a sentence of two years of probation with terms and conditions including DVI [domestic violence intervention treatment program] and also five days of jail. However, that jail should be stayed by this Court so that [Margaret's] head [is] in a noose, so to speak, so that she controls her own fate.

. . . .

Also the State feels that, according to information that has been provided to the State, an alcohol and substance abuse assessment and whatever treatment that might be recommended by that assessment would be appropriate. State feels that if a PSI [presentence investigation] had been conducted, that there would have been input from various parties regarding the necessity for the substance abuse and alcohol assessment and treatment.

Margaret's counsel objected to the request for an alcohol and substance abuse assessment by responding that

[t]he court heard that there was [sic] very specific reasons and very specific circumstances. The circumstances do not include any indication of any substance abuse or alcohol problems or involvement in any of these violations. We didn't hear anything at all to suggest that she was under the influence during any of these events.

## DISCUSSION

Margaret argues that (1) "the discretionary conditions of Margaret's probation regarding drug and alcohol assessment, treatment, urinalysis and prohibition of drug and alcohol use were not reasonably related to the factors set forth in HRS section 706–606"; and (2) "no evidence was presented to indicate that Margaret had a drug or alcohol problem which was related to the violation of the protective order herein[.]"

■ We conclude that evidence of a drug or alcohol problem related to the crime for which the defendant is being sentenced is not required to authorize a sentence to probation under the special conditions of "drug and alcohol assessment, . . . and prohibition of drug and alcohol use[.]" Our conclusion is based on the fact that HRS § 706–624(2) (1993) authorizes the court to impose conditions of probation that are "reasonably related to the factors set forth in section 706–606" and "reasonably necessary for the purposes indicated in section 706–606(2)[.]" The "factors" and "purposes" listed in HRS § 706–606 include:

(1) The nature and the circumstances of the offense and the history and characteristics of the defendant;

(2) The need for the sentence imposed:

(a) To reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense;

(b) To afford adequate deterrence to criminal conduct;

(c) To protect the public from further crimes of the defendant; and

(d) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

In other words, we conclude that in every case where a defendant is sentenced to probation, the court may impose the following special conditions of probation that were imposed in this case:

(3) You shall obtain a substance abuse assessment from a qualified evaluator selected by your Probation Officer. . . .

. . . .

(5) You shall not use any narcotic drugs or controlled substances without first obtaining a prescription for such drugs or substance.

■ We further conclude that the following special conditions of probation can be imposed when the "substance abuse assessment from a qualified evaluator selected by [the defendant's] Probation Officer" reveals that the defendant has a problem with drugs and/or alcohol.

(3) You shall ... faithfully and regularly undertake the course of treatment, if any, recommended by the assessment until you are clinically discharged within 14 days.

(4) You shall submit yourself to random testing for drugs and/or for alcohol within three (3) hours after your Probation Officer has requested such testing. You will be considered to have tested positive for the substance which the Probation Officer referred you for testing if you fail to the take the test. You shall always have with you sufficient monies to pay for the testing.

In *State v. Morris*, Appellant–Defendant Ricky Kalani Morris similarly argued that "the condition of drug testing was not reasonably related or reasonably necessary to his offense [of Burglary in the First Degree] since there was no evidence that his burglary was for the furtherance of drug use." 72 Haw. 67, 69, 806 P.2d 407, 409 (1991). The court rejected this argument and stated, "Appellant's argument seems to ignore that requiring that the probation condition of drug testing bear a reasonable relationship

to the offense committed is only one of many factors the court must consider in imposing a sentence. Rather, the court must also consider Appellant's history of past drug use, as well as the need to reflect the seriousness of not using drugs while on probation, to encourage his respect for the law and to deter future criminal conduct."[1] *Id.* at 70–71, 806 P.2d at 410. Similarly, even though Margaret's alleged alcohol and substance abuse habits are not directly related to her crimes, the court was authorized to impose special conditions of probation ordering Margaret to "obtain a substance abuse assessment from a qualified evaluator selected by [her] Probation Officer" and to "not use any narcotic drugs or controlled substances without first obtaining a prescription for such drugs or substance."

■ The trial court has broad discretion in imposing a sentence, and "must consider a variety of factors ... in exercising its discretion in fitting the punishment to the crime 'as well as the needs of the individual defendant and the community.' 'In any system which vests discretion in the sentencing authority, it is necessary that the authority have sufficient and accurate information so that it may rationally exercise its discretion.' Such information, is provided in a pre-sentence investigation report[.]" *State v. Lau,* 73 Haw. 259, 262, 831 P.2d 523, 525 (1992) (internal citations omitted).

Given the broad range of evidence that the judge could consider, the legislature wanted to ensure that there would be safeguards against inaccurate and incomplete information. As a result, the legislature passed HRS § 706-604(2),

"[which] afforded the defendant an opportunity to respond to the presentence report, and more importantly, an opportunity to rebut those sections in question. The end result of such a statutory scheme is to provide the sentencing judge with all relevant information on the offender's background, while affording the defendant

---

1. During the presentence investigation, Morris admitted "that he smoked six joints of marijuana daily, with his last use being between 1984 and 1985 ... he started drinking at about age 12, drinking an average of 14 cans of beer a day ...

[and that] although he reported that he stopped drinking in 1986, [he] indicated that he had been drinking at the time of the offense; he had consumed about five beers." *Id.* at 69, 806 P.2d at 409.

'(protection) against the inclusion of unfounded facts, derogatory information, statements, and conclusions.' "

*State v. Nobriga,* 56 Haw. 75, 80–81, 527 P.2d 1269, 1273 (1974) (internal citations omitted).

Here, a presentence report was not required because Margaret was not less than twenty-two years of age and the charged crimes were misdemeanors. When the court asked Margaret whether she wanted a presentence report, Margaret's counsel replied that "[Margaret] does not require one." Margaret argues that if the "State had a good-faith belief that Margaret required drug and alcohol assessment and treatment, [the State] should properly have requested a presentence report, particularly since defense counsel twice objected to the drug and alcohol conditions of probation."

█ A trial and/or a presentence report for the sentencing court is not the only way for the sentencing court to acquire information about a defendant's alleged substance abuse. In *State v. Murphy,* the Hawai'i Supreme Court explained that

[there is] no indication, based upon a reading of HRS § 706–604 and the Commentary corresponding thereto, that the Legislature intended to restrict a sentencing judge solely to the use of data contained within the pre-sentence report. . . . If the existence of pertinent and helpful information comes to the attention of the sentencing judge, he should not be required to disregard it on the mere formality that is not contained in the pre-sentence report. We conclude that the sentencing court is not limited to any particular source of information in considering the sentence to be imposed upon a defendant.

*Id.* at 59 Haw. 1, 21, 575 P.2d 448, 461 (1978).

We conclude that the sentencing court can determine whether the defendant has a problem with drugs and/or alcohol by ordering the defendant to "obtain a substance abuse assessment from a qualified evaluator selected by your Probation Officer[.]" In Margaret's case, if the "substance abuse assessment from a qualified evaluator selected by [Margaret's] Probation Officer" ordered in probation condition (3) indicates that Marga-

ret has a problem with drugs and/or alcohol, the court will then be authorized to impose condition (4). Therefore, we vacate condition (4) and remand for its amendment, as follows:

If the "substance abuse assessment from a qualified evaluator selected by your Probation Officer" required in condition "(3)" above indicates that you have a problem with drugs and/or alcohol, you shall thereafter submit yourself to random testing for drugs and/or for alcohol within three (3) hours after your Probation Officer has requested such testing. You will be considered to have tested positive for the substance which the Probation Officer referred you for testing if you fail to the take the test. You shall always have with you sufficient monies to pay for the testing.

## CONCLUSION

Accordingly, we vacate paragraph 4 of the *"TERMS AND CONDITIONS OF PROBATION "* attached to the April 16, 2002 Judgment and remand for its amendment and reentry, as amended, in accordance with this opinion. In all other respects, we affirm the Judgment.

Dissenting Opinion by LIM, J.

I would simply reverse special probation conditions 3, 4 and 5: and otherwise affirm. I therefore respectfully dissent.

First, the only "information" before the sentencing court regarding a substance abuse problem was mere innuendo, both indirect and contingent:

Also the State feels that, according to information that has been provided to the State, an alcohol and substance abuse assessment and whatever treatment that might be recommended by that assessment would be appropriate. State feels that if a PSI had been conducted, that there would have been input from various parties regarding the necessity for the substance abuse and alcohol assessment and treatment.

This is in stark and dispositive contrast to the "sufficient circumstances which justified

the imposition of the [drug-testing] condition" in *State v. Morris*, 72 Haw. 67, 68, 806 P.2d 407, 409 (1991):

> Appellant [(sentenced to probation on April 22, 1987)] admitted in his presentence report that he smoked six joints of marijuana daily, with his last use being between 1984 and 1985. He also revealed that he started drinking at about age 12, drinking an average of 14 cans of beer a day. Although he reported that he stopped drinking in 1986, Appellant indicated that he had been drinking at the time of the offense; he had consumed about five beers.

*Id.* at 68-69, 806 P.2d at 409. Although "the sentencing court is not limited to any particular source of information in considering the sentence to be imposed upon a defendant[,]" *State v. Murphy*, 59 Haw. 1, 21, 575 P.2d 448, 461 (1978), surely the sentencing court must have *some* basis of information *before* handing down a particular sentence. *See* Hawaii Revised Statutes (HRS) §§ 706-601 (1993 & Supp. 2003), -602 (1993), -603(2) (Supp. 2003), -604 (1993), -606 (1993) & -624(2) (1993).

Second, a lack of "sufficient circumstances which justif[y] the imposition of the condition" at sentencing, Morris, 72 Haw. at 68, 806 P.2d at 409, may not be remedied *after sentencing* by ordering a defendant to undergo a substance abuse assessment, with treatment and drug testing to kick in automatically if the evaluator decides the defendant has a substance abuse problem. This effectively deprives the defendant of her rights under HRS § 706-604, to "a fair opportunity...to be heard on the issue of the defendant's disposition[,]" HRS § 706-604(1); and to a "fair opportunity...to controvert or supplement" pre-sentence reports and diagnoses. HRS § 706-604(2). Moreover, it amounts to an improper delegation and abdication of the sentencing court's sentencing prerogative and responsibility. *Cf. State v. Gaylord*, 78 Hawai'i 127, 152-153, 890 P.2d 1167, 1192-93 (1995):

> For this reason, among others, HRS § 706-605(1)(d) limits restitution orders to "an amount the defendant can afford to pay." *See State v. Johnson*, 68 Haw. 292,

297, 711 P.2d 1295, 1299 (1985); *[State v. ]Murray*, 63 Haw. [12,] 25, 621 P.2d [334,] 343 [(1980)]. In this connection, and despite the fact that the sentencing court "may delegate to the Adult Probation Division the function of making recommendations on the amount of restitution and the manner of payment, the court has the exclusive responsibility and function of imposing a sentence." *Johnson*, 68 Haw. at 297, 711 P.2d at 1299. Thus, "requisite specificity should be provided by the sentencing court and ought not be left to subsequent administrative determination," *Murray*, 63 Haw. at 25, 621 P.2d at 343 (citations omitted), because "without express legislative authority, the court cannot delegate the sentencing function to another person or entity." *Johnson*, 68 Haw. at 297, 711 P.2d at 1299. *Cf. United States v. Porter*, 41 F.3d 68, 71 (2d Cir. 1994) (sentencing court cannot delegate to probation department, either as to amount or scheduling of installment payments, judicial functions inherent in grant of restitution); *United States v. Weichert*, 836 F.2d 769, 772 (2d Cir. 1988) (sentencing court may not authorize probation officer to make post-sentencing decision as to amount of restitution), *cert. denied*, 488 U.S. 1017, 109 S.Ct. 813, 102 L.Ed.2d 802 (1989); *United States v. Ahmad*, 2 F.3d 245, 248-49 (7th Cir. 1993) (sentencing court may not authorize probation officer to make post-sentencing decision as to scheduling of installment payments). Accordingly, "it is incumbent upon the sentencing court to enter into the record findings of fact and conclusions that the manner of payment is reasonable and one which the defendant can afford." *Johnson*, 68 Haw. at 297-98, 711 P.2d at 1299.

(Footnotes, ellipsis and original brackets omitted.) Indeed, the majority's holding, that every probation sentence may include a substance abuse assessment condition, effectively renders HRS § 706-624(2) a dead letter in this respect, a legislative act I doubt we are empowered to perform.